**CHAMPION INTERNATIONAL CORPORATION,**
Plaintiff-Appellee,

v.

**CONTINENTAL CASUALTY COMPANY,**
Defendant-Appellant.

**No. 956, Docket 75–7664.**

United States Court of Appeals,
Second Circuit.

Argued May 11, 1976.

Decided Dec. 9, 1976.

---

Seymour Shainswit, New York City (Kronish, Lieb, Shainswit, Weiner & Hellman, Martin A. Teicher, New York City, of counsel), for plaintiff-appellee.

Jack Hart, New York City (Hart & Hume, Cecil F. Holland, Jr., New York City, of counsel), for defendant-appellant.

Before MOORE and TIMBERS, Circuit Judges, and NEWMAN,* District Judge.

MOORE, Circuit Judge.

Continental Casualty Company ("Continental") appeals from a judgment of $1,320,139.64 ($1,000,000 plus interest) entered against it by the district court, after a non-jury trial, and in favor of Champion International Corporation ("Champion"). Jurisdiction exists under 28 U.S.C. § 1331.

This action involves the quite frequently perplexing problem presented in endeavoring to construe clauses in insurance policies. The policies in issue here were issued by Continental and Liberty Mutual Insurance Company ("Liberty Mutual") to Champion, to cover products liability losses which might be sustained by Champion. The material facts giving rise to the insurance claim underlying this action are not in serious dispute.

I

Champion, in 1969 and 1970, amongst many other products, sold vinyl-covered paneling to manufacturers of houseboats, house trailers, motor homes and campers. It purchased the paneling from Continental Vinyl ("Vinyl"). Not long after the panels had been installed in the various vehicles they commenced to delaminate, or in less technical parlance, to split apart. Naturally, claims were asserted against Champion for damages incurred, which in turn caused Champion to look to its insurance coverage.

Champion had two insurance policies: one, written by Liberty Mutual, covered products hazards and was in the amount of $100,000 for each "occurrence" ($200,000 aggregate) and subject to $5,000 deductible "per occurrence" for property damage liability; the second, written by Continental, an "Umbrella Excess Third Party Liability Policy" ("Umbrella Excess policy"), the policy period being three years from November 30, 1967 to November 30, 1970, provided for excess coverage over Champion's under-

lying insurance (namely, Liberty Mutual's policy) of $1,000,000 for "any one occurrence" and $1,000,000 in the aggregate for each annual period.

Thus, from a business point of view, Champion had assumed as a self-insurer the first $5,000 of any loss (the $5,000 deductible); it had the Liberty Mutual policy for the next $100,000 ($200,000 aggregate); and above these amounts, it had the Continental Umbrella Excess policy for $1,000,000.

As found by the trial court, some 1400 vehicles manufactured by some 26 different customer companies of Champion were damaged by the defective panels during the policy period.

Champion employed Liberty Mutual to investigate and settle such claims on a fee basis. As of September 13, 1974, Champion had paid Liberty Mutual $1,513,116.82 for property damage settlements which Liberty had effected. No question is raised as to the reasonableness of those settlements.

The trial proceeded on the basis of first determining liability. Once this was determined in plaintiff's favor, damages were easily ascertained because they were in excess of the upper limits of Continental's policy. Judgment thus was awarded for $1,000,000 plus interest.

II

We are confronted with a situation in which the trial court, finding in favor of the plaintiff, said "Each party contends that the language of the policies is clear and unequivocal and supports its contentions", but addressing the sole issue, namely, "whether there was one occurrence which proximately resulted in damage to many vehicles, or whether the damage suffered by each of those vehicles was a separate occurrence", found in favor of the plaintiff because it held "that the contested language is ambiguous"; that plaintiff's interpretation was a "reasonable one"; and that that "is all plaintiff is required to prove". *See* Joint appendix at 159–165.

* Honorable Jon O. Newman, United States District Judge for the District of Connecticut, sitting by designation.

The sole appellate issue is the scope to be attributed to the word "occurrence" in the policies.[1] If each occurrence means each of the 1400 individual installations of the defective panels, there is no liability under the Liberty Mutual policy because it is conceded that the damage in each instance did not exceed $5,000 and hence, would come within the $5,000 deductible provision. Nor would there be liability under the Umbrella Excess policy, for the same reason. If, on the other hand, the cause of Champion's damage, namely, the delivery of defective panels, is the "occurrence", then this delivery in the aggregate resulted in losses totalling some $1,600,000 of which $1,100,000 would be covered by the two insurance policies ($100,000 under the Liberty Mutual policy and $1,000,000 under the Umbrella Excess policy).[2]

Since Continental's policy was intended to cover excess liability, the question is presented: excess over what? Excess could only arise if coverage under Liberty Mutual's underlying policy was inadequate to compensate Champion for its losses. Therefore, reference must first be made to the appropriate provisions of the Liberty Mutual policy.

Under the Liberty Mutual policy, Liberty Mutual was to pay for property damage "caused by an occurrence" to a maximum of $100,000 payment for any one occurrence. Joint appendix at 491, 499, 510. To determine how the maximum was to be applied, the policy provided that "all . . . property damage arising out of continuous or repeated exposure to substantially the same general conditions . . . shall be considered as arising out of one occurrence." Joint appendix at 498–99.

Continental's policy indemnified Champion for property damage (defined as "ulti-

mate net loss") caused by or arising out of "each occurrence". Joint appendix at 448. Ultimate net loss was stated to be the "total sum which the Insured or any company as his insurer becomes obligated to pay by reason of [p]roperty damage. . . ." Joint appendix at 451.

As previously mentioned, this appeal centers around the question of what constitutes an "occurrence". The trial judge believed that the loss and the compensation therefor were determined on the basis of language in the respective policies which was ambiguous. We would prefer to examine the policies in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes.

We can immediately reject Continental's argument that there were 1400 separate occurrences. There could have been 1400 separate *claims* presented by the owners of the damaged vehicles against the 26 manufacturers; those are not before us. Such claims might have been funneled through the 26 manufacturers to Champion and Champion could have turned to the panel manufacturer, Vinyl, for protection, which it apparently did. However, Champion, as the seller of the defective paneling, was primarily liable and had paid out almost $1,600,000 on this liability. This amount was a sum which Champion (the *insured*) became *obligated to pay* by reason of *property damage* and hence, was encompassed within the Umbrella Excess policy's term "ultimate net loss".

Important in the interpretation of "occurrence" is Champion's selection, under the heading "Amount and basis of Deductible" in the Liberty Mutual policy, of a "per occurrence" basis (and its corresponding rejection of a "per claim" basis). This indi-

---

1. Appellant's arguments respecting the amount of damages awarded is inextricably bound up in the issue of whether one, or several, "occurrences" took place. The question of damages is factual, and is treated further in this opinion at p. 6049.

2. Continental represents in its reply brief that "Champion has recovered over $1 million from

Continental Vinyl's insurer and of the manufacturers of the vinyl film and of the adhesive used in the panels in an action in California based on exactly the same facts as form the basis for the instant action." Reply brief at 12. Whatever rights Continental may have by way of subrogation or otherwise are not before this Court on this appeal.

cates that the policy was not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances which resulted in the claim for damages.[3] Since the terms of the Liberty Mutual policy were made controlling over the Umbrella Excess policy,[4] this reading of the Liberty Mutual policy applies equally to that issued by Continental.

■ Although "occurrence" has received different interpretations in the many cases cited by the respective parties,[5] the definition given that term by the Umbrella Excess policy is controlling unless it is ambiguous (and we find no ambiguity here). Exposure there was, when Champion sold the paneling, and during this process, it was continuous and repeated. There is no dispute that damage resulted which was unexpected. Whether the property damage occurred *during* the policy period is a factual question which was resolved in Champion's favor below;[6] this finding is not subject to reversal unless it is clearly erroneous.[7] We have examined the record and find that the evidence presented to the district court fairly supports that court's conclusion; accordingly, the district court's finding will not be disturbed.[8]

Since we conclude that the plain language of the Umbrella Excess policy supports the liability of Continental on the insurance policy, we need not consider the applicable state rules for the interpretation of insurance policies which were discussed by the court below on the assumption that the policy in question was ambiguous.

For the foregoing reasons, the judgment of the district court is affirmed.

NEWMAN, District Judge (dissenting).

While I confess to some sympathy with the majority's effort to construe the terms of the insurance policy in a way that provides payments to the insured, I dissent from their conclusion because (1) in my view it is incorrect, and (2) unless the decision is limited to its precise facts, it can in the future lead to the *denial* to many insureds of substantial payments to which they are entitled.

1. We agree that the issue is whether in the circumstances indisputably established by the record there has been one or more than one "occurrence" within the meaning of the Liberty Mutual policy. We also agree that this issue can be resolved by the plain meaning of the words in the policy. We reach opposite conclusions as to that plain meaning.

---

**3.** We agree with the district court in *Stauffer Chemical Co. v. Insurance Co. of North America*, 372 F.Supp. 1303, 1307 (S.D.N.Y.1973), which held in an analogous situation, that:

"The use of the term 'occurrence' . . . rather than the more restrictive term 'accident' is consistent with an intention to afford coverage for 'all sums which the insured shall become legally obligated to pay' regardless of how such liability arose."

The same analysis applies with equal force to the use, in the policies at bar, of the term "occurrence" instead of the term "claim".

**4.** Endorsement No. 17 of the Umbrella Excess policy reads as follows:

"It is understood and agreed that in the event of loss for which the assured has coverage under the Underlying Insurance, the excess of which would be recoverable hereunder, except for terms and conditions of this policy which are not consistent with the underlying, then, notwithstanding anything contained herein to the contrary, this policy shall be amended to follow the terms and conditions

of the applicable underlying insurances in respect of such loss." Joint appendix at 487.

**5.** *See, e. g., Hartford Acc. & Ind. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973); *Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 371 N.Y.S.2d 444, 332 N.E.2d 319 (1975); *Aetna Casualty and Surety Co. v. Martin Bros. Container and Timber Products Corp.*, 256 F.Supp. 145 (D.Or. 1966).

Both parties in the instant case are agreed that New York law governs the controversy. However, it is not necessary for us to resort to state rules governing the construction of ambiguous insurance policies since, in our view of the case, the terms of the policies in question are not ambiguous.

**6.** Opinion of the district court, joint appendix at 159.

**7.** *See* F.R.Civ.P. 52(a).

**8.** *See generally*, 5A J. Moore, *Federal Practice* ¶ 52.03 (1975 ed.).

The policy defines "occurrence" to mean "*an accident, including injurious exposure to conditions,* which results during the policy period in bodily injury or property damage neither expected nor intended from the standpoint of the insured . . .." (Emphasis added). The policy also provides that for purposes of determining the limit of Liberty Mutual's liability, all personal injury or property damage "arising out of continuous or repeated exposure to substantially the same general conditions" shall be considered as arising out of one "occurrence." The majority implicitly assumes, and I agree, that this further definition of "occurrence" to mean "continued or repeated exposure to substantially the same general conditions" provides the meaning for construing the deductible clause, even though it applies in terms only to determining the limit of Liberty Mutual's liability.

On various occasions Champion purchased quantities of vinyl-covered paneling. It made a series of sales of this paneling in small lots over a period of several months to 26 different manufacturers. The paneling was ultimately installed, or made into products that were installed, in numerous vehicles. On approximately 1400 occasions the paneling delaminated, giving rise to a single claim for property damage for each instance of a product or vehicle damaged by the delamination.

The majority's initial step toward its conclusion of a single occurrence is to reject the possibility of 1400 different occurrences as somehow inconsistent with the fact that there were 1400 different claims. Reliance is placed on the insured's selection of a "per occurrence" rather than a "per claim" basis for computing the deductible. Of course occurrences and claims are not necessarily the same in number, but they are not necessarily different either. The occurrence is the event that gives rise to the claim. It is entirely possible to have one claim per occurrence, or, if the occurrence is of the sort where one event causes injury to several persons or to property owned by several persons, to have several claims per occurrence. The fact that the insured selected a "per occurrence" basis is of no help in determining whether in the circumstances of this case there has been one occurrence, or several occurrences, or a number of occurrences precisely equal to the number of claims.

Having rejected the possibility of 1400 occurrences, the majority then uses two different approaches to conclude that the facts of this case constitute one occurrence within the meaning of the Liberty Mutual policy. First, it suggests that the single occurrence is "the delivery of defective panels." *Supra* at 505. Even if a delivery of defective panels could be considered to be "an accident" or "the same general conditions" exposure to which on a continuous and repeated basis gave rise to the damage, the undeniable fact is that there was not a single delivery. There were at least 26 deliveries to the 26 different manufacturers, and, in view of the periodic sales in small lots, very likely far more than 26 deliveries.

Secondly, the majority endeavors to identify a single occurrence that fits the policy's reference to "property damage arising out of continuous or repeated exposure to substantially the same general conditions." In what seems more like a pun than a construction, the majority observes: "Exposure there was, when Champion sold the paneling, and during this process, it was continuous and repeated." *Supra* at 506. When Champion sold the paneling, there was created "exposure" to legal liability, not a single occurrence of continuous or repeated exposure to substantially the same general conditions that cause the damage.

In my view the "exposure to conditions" clause has doubtful application to the type of damage that happened in this case, and even if it applies, there would still be 1400 occurrences, not one. That clause concerns damage that occurs when people or property are physically exposed to some injurious phenomenon such as heat, moisture, or radiation. The clause simply broadens the policy's definition of "occurrence" beyond the word "accident" to include a situation where damage occurs (continuously or re-

peatedly) over a period of time, rather than instantly, as the word "accident" usually connotes. Moreover, the "exposure" clause concerns continuous or repeated exposure to conditions existing at or emanating from *one location*. Indeed, Continental's excess coverage policy, which also defines "occurrence" as an event or a continuous or repeated exposure to conditions, specifically provides that "exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed to be one occurrence."

To apply the "exposure to conditions" clause to delamination damage puts considerable strain on the words "exposure" and "conditions." The insured contends that the "conditions" to which the property suffering damage was exposed were the defective panels, and that the "exposure" was not the process of selling the panels, as the majority suggests, but rather the installation of the panels. I have difficulty with the concept of a product suffering damage by exposure to its principal component. But even if delamination damage to a product made of laminated paneling can be said to result from "exposure" of the product to the "conditions" of the paneling, that construction of the "exposure" clause does not help decide whether there was one occurrence or 1400. Under this construction, if delamination occurred at a single location, all resulting damage from that delamination would be one occurrence no matter how gradually the damage was sustained.[1] But 1400 delaminations occurring at 1400 different times and places are 1400 occurrences.

The question is whether an "occurrence" within the meaning of a distributor's product liability policy means the event in which the defect in the product causes damage, or some earlier event in the distribution process. Or, to put it another way, an occurrence means one event, not several events, and the question here is which event is the occurrence contemplated by the policy definition. The cases have consistently construed "occurrence" or "accident" in liability policies to mean the event for which the insured becomes liable, and not some antecedent cause of the injury. See, *e. g.*, *Hamilton Die Cast, Inc. v. United States Fidelity and Guaranty Co.*, 508 F.2d 417 (7th Cir. 1975); *Maurice Pincoffs Co. v. St. Paul Fire and Marine Insurance Co.*, 447 F.2d 204 (5th Cir. 1971); *Arthur A. Johnson Corp. v. Indemnity Insurance Co. of North America*, 7 N.Y.2d 222, 196 N.Y.S.2d 678, 164 N.E.2d 704 (1959). Even if all of the paneling was improperly manufactured at one time by Champion's vendor (a proposition Continental does not concede and which is not established in the record), that is not the event for which Champion became liable. What Champion became liable for were the 1400 instances of delamination that occurred and caused damage at 1400 different times and places. Each instance of delamination caused damage. There is simply no basis for combining those separate events, widely separated in time and space, into one "occurrence."

2. What makes this case unusual is that both parties are urging precisely the opposite contentions normally advanced by an insured and his insurer when the unitary nature of events is in issue. If several claims are presented, the insured wants payment for each (up to the aggregate limits of his policy), and the insurer usually wants the events viewed as a single occurrence so that payments will not exceed the policy limit for a single occurrence. In this case, the fortuity of a series of small claims, each falling below the deductible amount, has impelled the insured to contend for a single occurrence; otherwise each claim is its responsibility under the deductible clause. The insurer urges multiple occurrences so that the deductible clause will preclude any liability on its part. But what would the parties be urging (and the majority concluding) if serious personal injury had occurred, resulting in a series of claims each of which exceeded the deductible?

---

1. It is equally clear that there can be a single occurrence if property at various locations is damaged by continuous or repeated exposure to a source of injury at a single location, as when one source of radiation causes gradual damage to many items at different places.

Obviously the parties would then be in their accustomed roles, with the insured claiming multiple occurrences, and the insurer claiming a single occurrence. If, for example, a distributor bought a supply of defective tires, sold them to 26 retailers, and 1400 automobiles crashed seriously injuring at least one occupant per crash, would the distributor be urging us to conclude that his policy affords protection only up to the limit provided for one occurrence? Would he be contending that the installation of the tires was an "exposure" to the "conditions" of defective manufacture?

The fact that the claims in this case are small enough to make it advantageous for the insured to contend that the facts show only one occurrence does not persuade me that its position is correct. What concerns me about a decision upholding that position is the implication for future cases where similar reasoning might free an insurer from its proper responsibility for substantial claims. I hope my fears are unwarranted.