CHAMPION INTERNATIONAL
CORPORATION, Plaintiff,

v.

LIBERTY MUTUAL INSURANCE
COMPANY, Defendant and
Third–Party Plaintiff,

v.

AETNA CASUALTY & SURETY
COMPANY, Third–Party
Defendant.

No. 87 Civ. 1634 (WCC).

United States District Court,
S.D. New York.

Nov. 14, 1988.

Anderson Russell Kill & Olick, P.C., New York City (Eugene R. Anderson, of counsel), for plaintiff.

Jacob, Medinger & Finnegan, New York City (Peter J. McKenna, of counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This diversity action arises out of a dispute over product liability insurance coverage between plaintiff Champion International Corporation ("Champion"), a manufacturer and distributor of building products, and Liberty Mutual Insurance Company ("Liberty Mutual"). The action is presently before the Court on Champion's motion for summary judgment.

## BACKGROUND

For at least twelve years, until October 31, 1979, Liberty Mutual provided Champion with primary Comprehensive General Liability ("CGL") insurance. From October 31, 1970 until October 31, 1977, these CGL policies limited Champion's coverage to $100,000 per occurrence and $200,000 in the aggregate. From October 31, 1977 until October 31, 1979, Champion's coverage under the CGL policies increased to $1,000,-000 per occurrence and $1,000,000 in the aggregate. The CGL policies in force during the period October 31, 1970 to October 31, 1973 were subject to a $5000 deductible per occurrence.

In addition, during the period October 31, 1971 to October 31, 1973, Liberty Mutual provided Umbrella Excess Liability ("UEL") insurance to Champion for liability

exceeding the amounts covered by the applicable CGL policies. The UEL policy provided a liability limit of $1,000,000 per occurrence and $1,000,000 in the aggregate.[1] Under the terms of the CGL and UEL policies, Liberty Mutual agreed not only to indemnify Champion, but also to defend Champion and pay costs and reasonable expenses incurred in defending any product liability claims occurring during the policy periods.

In 1981, a group of California homeowners sued Champion for damages resulting from the delamination (i.e. peeling apart) of Malaysian plywood manufactured and distributed by Champion and installed in their homes (the "Regency Park Action"). In 1986, Champion settled the Regency Park Action, paying a sum of $1,967,500 to the homeowners. A disagreement between the parties over the indemnification of defense and settlement costs provides the basis for this action.

Champion has brought this motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. In its complaint, Champion sought relief for the full sum of $1,967,500 it paid to the homeowners in accordance with the settlement, with interest. It also sought to recover defense costs. In the initial brief it submitted supporting this summary judgment motion, Champion reduced its request for relief to $1,000,000 plus interest and costs.[2] Finally, in its reply brief, Champion asked this Court to enter partial summary judgment for only $140,812, with interest, to rule invalid Liberty Mutual's contention that it need not indemnify Champion for damage not manifest before October 31, 1979, and to order

an accounting to determine the value of the rest of its claim.

Liberty Mutual, on the other hand, originally conceded in the brief it submitted opposing summary judgment that it was willing to pay Champion $140,000 for the Regency Park Action, and indicated that it had already paid Champion approximately $350,000 with respect to other losses resulting from defective Malaysian plywood. However, in its reply brief, Liberty Mutual contends that Champion is not entitled to partial summary judgment for $140,812 because under Champion's own theory of the case, Champion could be denied any relief. In other words, in its reply brief, Liberty Mutual backs away from its original position, announcing that it will concede nothing to Champion now, because Champion might fare worse under its own theory than under Liberty Mutual's.

Champion's theory supporting its motion for summary judgment is that Liberty Mutual must indemnify it under the terms of the UEL policy[3] for the entire settlement amount in the Regency Park Action, irrespective of whether each instance of damage suffered by a Regency Park homeowner became apparent before the expiration of Liberty Mutual's coverage in 1979. All the instances of damage, according to Champion, constitute a single "occurrence" under the terms of the UEL policy. The final component of Champion's theory is that the "occurrence" was the date of the "first recorded loss" (i.e. the first claim brought by someone suffering property damage from the defective Malaysian plywood, long before the Regency Park damage became manifest), which Champion in-

---

1. In addition, the UEL policy stated that, "The insured's retention is $25,000." It also contained a loss reimbursement provision which required Champion to reimburse Liberty Mutual for "25% of the first $500,000 of all loss paid by [Liberty Mutual] because of any one occurrence." Brown Affidavit, Exhibit 3.

2. Champion acknowledges in its brief that it has asserted a claim against another insurer for the amount of its loss exceeding the $1,000,000 limit in the allegedly applicable UEL policy provided by Liberty.

3. Liberty Mutual contends that Champion is estopped from asserting in this motion that it is entitled to indemnification under the UEL policy, because "[the] complaint alleges that indemnification is sought under eleven insurance policies ... [yet], the complaint omits any reference to the excess policy...." Defendant's Brief at 3. Liberty Mutual's argument is baseless, because Champion's amended complaint refers to "policies" which are listed in Exhibit A, and the final policy on the Exhibit A list is the UEL policy. Plaintiff's Amended Complaint ¶ 9.

sists is February 11, 1971.[4]

Liberty Mutual argues in opposition that, under the plain terms of the UEL policy, each manifestation of damage from the defective plywood is a separate "occurrence" covered by the individual policy applicable at the time the damage arises. Thus, it contends that the UEL policy is inapplicable to any damage first manifested after it expired on October 31, 1973. Furthermore, it also disclaims responsibility for any damage arising after its last CGL policy expired on October 31, 1979. As far as Liberty Mutual is concerned, Champion's current insurer, Aetna, bears the responsibility for those losses.

Additionally, Liberty Mutual argues that even if all the Malaysian plywood claims constitute one "occurrence," the exact date triggering coverage remains unclear and is an issue of fact precluding summary judgment. Liberty Mutual asserts that the February 11, 1971 "first recorded loss" submitted by Champion is not the proper "occurrence." It claims that the "occurrence" is the date when the Malaysian plywood was originally delivered or sold, and argues further that it needs discovery to ascertain when that was. Liberty Mutual suggests that the "occurrence" may actually precede the period covered by its UEL policy, and that, if true, this would bar any recovery by Champion.[5]

For the reasons stated hereinafter, the motion for summary judgment is denied.

## DISCUSSION

The legal issue underlying the shifting demands and concessions of the parties is what constitutes an "occurrence" under the UEL policy.

### A. The Terms of the UEL Policy

There are three applicable provisions in the UEL policy. The first is a section entitled "Limits of Liability." It provides

that, "all ... property damage arising out of continuous or repeated exposure to substantially the same general conditions ... shall be considered as the result of one and the same occurrence." Brown Affidavit, Exhibit 3.

The second is an endorsement named "Application of Occurrence Limit," which states:

> It is agreed that for the purpose of determining the limit of the company's liability ... all property damage ... that is caused by the failure of the insured's products ... to meet the level of performance, quality, fitness or durability warranted or represented by the named insured, to the extent that such failure is caused by the same improper conditions ... shall be considered as arising out of one and the same occurrence.

*Id.* at Endorsement Serial No. 7.

Finally, the "Limits of Liability" section previously mentioned contains a sub-section called "Non–Cumulation [sic] of Liability— Same Occurrence." It says:

> If the same occurrence gives rise to ... property damage ... which occurs partly before and partly within any annual period of this policy, the each occurrence limit and the applicable aggregate limit or limits of this policy shall be reduced by the amount of each payment made by the company with respect to such occurrence....

Brown Affidavit, Exhibit 3.

### B. What Constitutes An "Occurrence"?

Champion contends that the language in the UEL policy is ambiguous, and that under New York law, which both parties agree applies in this case, ambiguity in an insurance policy must be resolved in favor of the insured under the doctrine of contra proferentem. I disagree that the language here is ambiguous. Consequently, I decline to apply the New York rules for inter-

---

**4.** Champion seeks indemnification under the UEL policy because the primary CGL policy covering 1971 is exhausted.

**5.** The only UEL policy offered by Liberty Mutual covers the period October 31, 1971 to October

31, 1973. Therefore, if the date of "occurrence" is prior to this period, it would be covered by a CGL policy which is by now exhausted, and ostensibly, Liberty Mutual would owe Champion nothing.

preting ambiguous terms in insurance policies.

The Court of Appeals for the Second Circuit, in a case with the same plaintiff as this case and nearly identical facts, has construed identical language, and found it unambiguous. In *Champion International Corporation v. Continental Casualty Co.*, 546 F.2d 502 (2d Cir.1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977), the Court, applying New York law with respect to the interpretation of unambiguous words in a contract, opted to examine the language in a UEL insurance policy, "in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *Id.* at 505. I choose the same path in the current action.

In *Champion International*, like the case before me now, Champion sought to be indemnified by an insurance company for damage payments it made to those who had incurred property damage from the delamination of plywood panels it had sold. The insurance company argued that each manifestation of damage was a separate "occurrence", and that since none of the property damage claims exceeded the $5000 "per occurrence" deductible set by its policy, it owed Champion no money.

The Court of Appeals, rejecting the argument that each claim represented a separate "occurrence," stated that "the policy was not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather to the underlying circumstances which resulted in the claim for damages." *Id.* at 506.[6] The Court arrived at its conclusion that individual claims were one "occurrence" if they arose from the same circumstances after explaining that the insurance policy allowed the purchaser of insurance to choose whether the policy's deductible would operate on a "per claim"

or "per occurrence" basis. The fact that the policy recognized a difference between "claims" and "occurrences," and that Champion had selected a "per occurrence" deductible rather than a "per claim" deductible, persuaded the Court of Appeals that it was not harm but instead the circumstances creating harm which both the policy and the parties contemplated as an "occurrence." *Id.*

The Court of Appeals for the Second Circuit recently reaffirmed, albeit in dicta, the holding in *Champion International*. In *Newmont Mines Ltd. v. Hanover Insurance Co.*, 784 F.2d 127 (2d Cir.1986), the Court, citing a string of cases from various jurisdictions, wrote:

> In construing the term "occurrence" as used in liability insurance policies, courts generally "have concluded ... the number of occurrences for purposes of applying coverage limitations is determined by reference to the cause or causes of the damage and not the number of injuries or claims."

*Id.* at 135 & 136 (citing *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374, 379 (6th Cir.1984)). Distinguishing product liability insurance policies from property damage insurance policies, the Court cited *Champion International* and concluded:

> In the liability context, we have found that the selection of a "per occurrence" basis and the corresponding rejection of a "per claim" basis indicated that the liability policy was not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances which resulted in the claims for damages ... A liability policy is intended to protect an individual or a business from liability for their tortious conduct. Consequently, since that is the "business purpose sought to be achieved by the parties," it

---

6. In its brief opposing Champion's motion, Liberty Mutual points to the "Non–Cumulation [sic]" clause in the UEL policy as corroborative of its manifestation theory. However, the policy at issue in *Champion International* contained an identical clause, which the lower court reproduced in its opinion, and both the District Court

and the Court of Appeals nevertheless concluded that the underlying cause of harm and not the manifestation of harm counted as an "occurrence" under the policy. I refuse to depart from the well-reasoned decisions of those courts.

is eminently reasonable to look to the underlying conduct or cause of that liability.

*Id.* at 136.[7]

■ The language in the UEL policy at issue here is indistinguishable from the language interpreted by the Court of Appeals in *Champion International.*[8] Furthermore, it is exactly the kind of product liability policy discussed by the Court of Appeals in *Newmont Mines.* Liberty Mutual argues in its brief, however, that *Champion International* is distinguishable from the case at hand, and ignores *Newmont Mines.* Liberty Mutual contends that the definition of "occurrence" articulated in *Champion International* applies only for the purpose of aggregating claims in order to exceed the policy's deductible limit. Liberty Mutual urges that, apart from calculating whether damages exceed the policy's deductible limit, each manifestation of damage represents a separate "occurrence." Defendant's Brief at 12.

The Appeals Court in *Champion International* gave no indication that it sought to limit its ruling to its facts and create two distinct and inconsistent interpretations of "occurrence," one for calculating whether damages exceed the policy's deductible limit, and one for determining whether an "occurrence" happens during the term of the policy. This Court refuses to read such an intent into the Appeals Court's decision. I remain convinced, especially in light of the principle's reaffirmation in *Newmont Mines,* that the Appeals Court in *Champion International* was articulating a more

general principle of law when it held that individual instances of damage comprise one "occurrence" where the underlying cause of harm is the same.[9]

This Court finds that the UEL policy's language is unambiguous, and holds that, based on the business purpose of the parties and the plain meaning of the policy's language, all of the individual claims of property damage comprising the Regency Park Action, and resulting from delamination of Champion's Malaysian plywood, relate back to one "occurrence" which gave rise to the damage upon which the claims are based.

## C. The Standard For Summary Judgment

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *Knight v. U.S. Fire Insurance Company,* 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of

---

**7.** Although the Court of Appeals in *Newmont Mines* was actually interpreting the term "occurrence" in the context of a property damage insurance policy and not a product liability insurance policy, it thoroughly discussed the definition of "occurrence" in the product liability context in order to contrast the differences between the two types of insurance policies.

**8.** Not only is the language in the UEL policy here nearly identical to the language of the UEL policy in *Champion International,* but Champion selected its deduction on a "per occurrence" basis in the current UEL policy as well.

**9.** Liberty Mutual, in another attempt to circumvent *Champion International,* argues that in the case at hand, manifestation is equivalent to "in-

jury in fact," and cites *American Home Products v. Liberty Mutual Insurance Co.,* 748 F.2d 760 (2d Cir.1984) for the proposition that an injury in fact is an "occurrence" under the terms of the UEL policy. *American Home Products* does not apply to the current situation because there, the Court addressed a CGL policy covering only "personal injury, sickness, or disease," with terms substantially different from the terms in the UEL policy at issue here. Furthermore, the Court in that case recognized the special nature of the "progressive disease" or "insidious disease" context. Indeed, the Court of Appeals in *Newmont Mines* did not see fit to mention *American Home Products* when it reaffirmed the holding of *Champion International.*

fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight* 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed. 2d 202 (1986).

### D. Applying the Standard To the Present Action

 Even though the individual instances of damage in the Regency Park Action relate back to one "occurrence," both parties contest whether the "occurrence" was the "first recorded loss," "date of sale," or "date of delivery." Each side proffers evidence supporting its construction of the term "occurrence."

Champion takes the position that the "occurrence" was February 11, 1971. Champion alleges that this was the "first recorded loss," when, it says, someone first claimed to have been damaged by the defective plywood. Brown Affidavit, Exhibit 4. Liberty Mutual counters that the "occurrence" was the date the panels were either sold or delivered to the Regency Park homeowners. Defendant's Reply Brief at 8. The UEL policy offers no guidance for when to fix the "occurrence."

Summary judgment is inappropriate when an ambiguous term is susceptible of more than one reasonable interpretation. *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2nd Cir.1983). In *Schering*, the Court of Appeals reversed a lower court's grant of summary judgment on the ground that, "The trial court failed to apply

our rule that summary judgment cannot be granted where . . . the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact." *Id.* In the case at bar, Liberty Mutual's contention that the "occurrence" was either the "date of sale" or the "date of delivery" is certainly a reasonable construction of "occurrence." Indeed, Liberty Mutual's construction accords with the Court's construction in *Champion International.* There, the Court of Appeals implied that either the "date of delivery" or the "date of sale" of the defective plywood panels constituted the "occurrence." [10]

Depending upon the date to which the "occurrence" is attributed, Champion may or may not be denied coverage. Setting a date for the "occurrence" is therefore central to the resolution of the dispute between the parties, because it goes to the heart of whether the liability incurred by Champion is covered by the UEL policy. Liberty Mutual, the non-moving party, has offered a reasonable interpretation of a material disputed term, and summary judgment must therefore be denied. *N.Y. State Energy, etc. v. Nuclear Fuel Services*, 666 F.2d 787, 790 (2d Cir.1981).

Not only must the factfinder determine whether the "occurrence" was the "first recorded loss," "date of sale," or "date of delivery," but it must also fix an exact date for whichever of these incidents it chooses in order to determine whether the property damage "occurred" during the policy period.[11] Summary judgment is inappropriate here because a material question of fact exists as to whether any of these critical dates fall within the UEL policy period.

1) "First Recorded Loss"—Champion claims that the "first recorded loss" was February 11, 1971. Brown Affidavit, Exhibit 4. Liberty Mutual contends that the "first recorded loss" may precede February

---

**10.** At one point in its opinion in *Champion International,* the Court of Appeals refers to the cause of damage by saying, ". . . namely, the delivery of defective panels. . . ." *Champion International,* 546 F.2d at 505. At another point in its opinion, the Court, in discussing the term "occurrence," writes, "Exposure there was, when Champion sold the paneling . . . There is

no dispute that damage resulted which was unexpected." *Id.* at 506.

**11.** In *Champion International,* the Court of Appeals wrote, "Whether the property damage occurred during the policy period is a factual question. . . ." *Champion International,* 546 F.2d at 506.

11, 1971, because there is evidence that some earlier damage claims may have been treated by Champion as a "customer relations problem," and therefore gone unreported. Defendant's Brief at 27; Kronenwetter Affidavit, Exhibit C. Certainly this is an issue of fact warranting resolution at trial.

2) "Date of Sale" and "Date of Delivery"—Champion mentions different dates in various documents. In its amended complaint, Champion asserts only that "In or about 1966, certain Malaysian plywood which was manufactured by Champion was installed in certain residential homes." Amended Complaint ¶ 10. However, in its 3(g) statement and supporting affidavit, Champion states that it sold plywood panels from April, 1970, until August, 1973, and that these panels were purchased by the Regency Park homeowners from June, 1971, until December 1972. Plaintiff's 3(g) Statement ¶¶ 6, 9; Brown Affidavit ¶¶ 9, 11. Liberty Mutual, in its own 3(g) statement, contends that there exists a genuine issue to be tried concerning "the dates on which the Malaysian plywood panels that were the subject of the Regency Park action were manufactured, sold, delivered and/or installed...." Defendant's 3(g) Statement ¶ 5. As with the "first recorded loss," the parties are entitled to present evidence and have the factfinder determine when the plywood panels were sold and delivered.

Champion protests Liberty Mutual's failure to provide specific facts supporting its opposition to this motion for summary judgment. This Court recognizes the skeletal nature of Liberty Mutual's 3(g) statement and affidavit. However, where discovery has not yet been conducted or concluded, courts have been disinclined to grant summary judgment. *Schering Corp. v. Home Insurance Co.*, 712 F.2d at 10 ("Summary judgment should not be granted while the party opposing judgment timely seeks discovery of potentially favorable information."); *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2511 n. 5, 91 L.Ed.2d 202 (1986) (The Court

limited its statement that a party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial" by writing: "This requirement ... is qualified by Rule 56(f)'s provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."); *See also, Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (The Court explained its decision by noting that, "The parties had conducted discovery, and no serious claim can be made that respondent was in any sense 'railroaded' by a premature motion for summary judgment. Any potential problem with such premature motions can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery"). The policy behind this approach is a sensible one—a party should have the opportunity to obtain relevant information before being required to "set forth specific facts showing that there is a genuine issue for trial."

In the case at bar, Liberty Mutual has had no opportunity to conduct discovery because this Court stayed discovery pending the outcome of this motion. Champion maintains that Liberty Mutual has had ample opportunity to gather all the necessary facts to oppose summary judgment in this action because it defended the Regency Park Action in 1980 and was aware of other Malaysian plywood claims since 1975. Plaintiff's Reply Brief at 22. The simple fact remains, however, that Liberty Mutual never before had any reason to determine when Champion manufactured, sold, or delivered the plywood to the Regency Park homeowners, because as Champion well knows, Liberty Mutual has always acted under the assumption that each manifestation of harm triggered liability.[12] This Court will not ring down the curtain on this action without permitting Liberty Mutual to gather the facts it needs to mount a defense. Summary judgment is denied.

---

12. Champion insists that, under New York law, Liberty Mutual is equitably estopped from obtaining discovery or disclaiming coverage be-

cause, it alleges, Liberty Mutual defended the Regency Park Action without making a timely reservation of its right to deny coverage. Plain-

*E. Champion's Request for an Accounting*

■ Champion also requests that this Court require Liberty Mutual to file an accounting to determine the exact amounts Liberty Mutual has already paid Champion for the Regency Park Action and other claims relating to defective Malaysian plywood, and to pinpoint the policies to which these payments have been assigned.

Liberty Mutual asserts that it has paid at least $350,000 to Champion for Malaysian plywood claims, and that the policy limits may be fully or partly exhausted by payments for unrelated claims. Defendant's 3(g) Statement ¶ 11; Kronenwetter Affidavit ¶ 5. Champion asserts it has received no payments from Liberty Mutual for the Regency Park Action and admits in its reply brief that, "Liberty Mutual has certainly confused the 'numbers' thereby precluding a grant of complete summary judgment in Champion's favor...." Plaintiff's Reply Brief at 1. Clearly, there exist issues of fact as to how much money, if any, has already been paid to Champion by Liberty Mutual, and how close to the limit on liability the payments have come.

An accounting is not necessary to produce this information. The discovery process should provide an ample opportunity for Champion to obtain the information it says it needs. Champion has offered no authority supporting intervention by this Court, and is not entitled to such relief at this time. Champion's request for an accounting is denied.

## CONCLUSION

For the reasons set forth above, summary judgment is denied.

SO ORDERED.

---

tiff's Reply Brief at 16. I need not pass on the merits of this argument, because equitable estoppel is an issue correctly left for the factfinder. *See Spinosa v. Hartford Fire Insurance Co.,* 90 A.D.2d 574, 456 N.Y.S.2d 140, 142 (1982); *Commercial Union Insurance Co. v. Internation-*

*al Flavors & Fragrances, Inc.,* 822 F.2d 267, 273 (2d Cir.1987) ("It is clear that waiver is a proper issue for the trier of fact, and New York courts have held that to be the case as to equitable estoppel also.")