LAY, Circuit Judge,
dissenting:
I.
The majority holds that “each claim arose from a separate occurrence, and a single deductible is applicable to each claim.” I must respectfully disagree. Such a construction is not supported by the law of New York. The consequence of the majority’s conclusion, based upon the idea that the exposure of the claimants is an “occurrence,” is that each subsequent exposure would also count as a separate occurrence. The majority recognizes this possible consequence of its logic, but avoids it by simply stating that American Steamship Owners Mutual Protection and Indemnity Association (“American Club”) does not make such an argument. The majority opinion stops short of this unavoidable and unreasonable conclusion and instead concludes that the intent of the parties was that “each claimant’s first exposure in the policy period is the final unfortunate event which causes injury. ...”[1] In all due respect, such a construction depends solely on a fictional hypothesis.
The majority acknowledges that in Arthur A. Johnson Corp. v. Indemnity Ins. Co., 7 N.Y.2d 222, 228, 164 N.E.2d 704, 707, 196 N.Y.S.2d 678, 683 (1959), the term “accident” was defined by the “unfortunate event” test. In Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 173, 305 N.E.2d 907, 910, 350 N.Y.S.2d 895, 899 (1973), the court of appeals used the unfortunate event test to define the term “occurrence.” In these two cases, however, it was not necessary to determine whether occurrence and accident were intended to have different meanings.
In Uniroyal, Judge Weinstein observed that the policy at issue in the Agent Orange case read that occurrence was not identical to accident, but includes accident as well as “event,” “happening,” and “continuous or repeated exposure to conditions.” Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp. 1368 (E.D.N.Y.1988). Judge Weinstein then observed: “The insurance industry developed this newer ‘occurrence’ definition in order to provide clearly for coverage of gradual, continuous, and prolonged events that might have been excluded by the instantaneous connotation of ‘accident.’ ” Id. The cases which he thereafter cites state that “occurrence provides broader coverage than ‘accident.’ ” Id. (citing Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135-36 (2d Cir.1986)).
The policy language of the American Club provides coverage for “accident or occurrence.” Although the policy language in the instant case is not identical to that construed by Judge Weinstein in Uniroyal, it is similarly fundamental that the two terms in the policy at issue were not intended to mean the same thing because they are set forth in the disjunctive. In any event, relying on the definition in Webster’s Third New Int’l Dictionary 1561 (unabridged ed.1981), the majority adheres to New York law and applies the “unfortunate event” test to define an occurrence. The majority opinion, however, thereafter equates both the event and injury as the definition of occurrence. It is at this juncture I must respectfully part company.
As Judge Weinstein observed:
Neither the Johnson nor the Wesolowski court provided any guidance, apart from the “average man” aphorism, on how to identify the “unfortunate event” or on how to distinguish among several plausible such *88 events. All that can surely be drawn from those two cases is that the “unfortunate event” is not the “negligent act or omission” and it is not the injury to each victim. The “unfortunate event” is evidently one of the several happenings, with the exception of the negligent act or omission, which precedes and contributes to the resulting injury.
Uniroyal, 707 F.Supp. at 1382. Judge Wein-stein identified “interrelated casually contributing events” in the Agent Orange case and then goes on to say: “In this sense, the terms of the definition of ‘occurrence’ are partly ambiguous: they identify a set of possible occurrences, but give little assistance in selecting the proper item from that set.” Id.
In the present case, the majority summarily dismisses the Uniroyal analysis on the ground that the policy in Uniroyal specifically provided that the occurrence was defined not to be the injury; that the injury was stated to be the result of the occurrence.[2] It is true that the American Club policy does not contain the same language as the Uniroyal policy. However, this is not fatal to the analysis. More critical to the point is the fact that the policy does not contain a definition that occurrence means both “the event and the injury resulting therefrom.” The policy is ambiguous.
Under these circumstances one could urge that the most favorable construction of the ambiguity should be resolved in favor of the insured, Prudential Lines, Inc. (“PLI”).[3] However, more importantly, because the term is not defined, a common understanding dictates that an “unfortunate event” (an occurrence) is what causes an injury and unless defined to the contrary, common principles of cause and effect should govern a basic understanding. The court in Uniroyal quotes from the Sixth Circuit case of Michigan Chem. Corp. v. American Home Assurance Co., 728 F.2d 374 (6th Cir.1984), to illustrate this view:
The vast majority of courts ... have concluded that although injury must be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by reference to the cause or causes of the damage and not to the number of injuries or claims. The number and timing of injuries is relevant in addressing the distinct question of the policy period to which each injury will be assigned.
The definitions of “occurrence” in the present insurance policies reflect this approach .... The language makes the [event] constituting the occurrence logically distinct from the injuries which later take place_ We hold that ... the policy terms admit of only one reasonable interpretation.
Michigan Chemical, 728 F.2d at 379.[4]
Under the majority’s approach, the policy is triggered at the time of the injury (the exposure of a claimant) which is likewise construed to mean the occurrence. In common parlance, however, it is only logical that an event is separate from the damage it causes. The policy language in Uniroyal is nothing more than a re-statement of the common understanding of the relationship between “occurrence” and “injury.” If one *89 slips and falls on a slippery floor, injury may or may not happen. A person may fall and not discover until months later that a herniated disc was caused by the fall. The occurrence was not the injury but the fall. Similarly, one can be exposed to asbestos and not be harmed. Twenty years ago the federal government ordered that all asbestos insulation be removed from all federal buildings. The repeated exposure of government workers from the time of installation to the time of removal did not result in reported injuries. To urge that the unfortunate event is the initial exposure (injury) of the claimant to the asbestos adopts nothing more than a fictional analysis which will deprive, at least in the present case, thousands of injured claimants of their lawful damages under the policy.
The occurrence and the injury it produces need not have any relationship to each other in time or place. The time of the occurrence producing the ultimate injury is irrelevant to triggering the policy. The majority’s argument that it is the immediate event (the exposure) rather than the remote cause of injury (the presence) merely states a principal of causation (proximate cause) which is intended to avoid but-for reasoning. But the immediate event created by PLI in this case is not a multiple accident but a continuous condition which ultimately could and did result in bodily injury to over 8,000 seamen. The individual exposures were not caused by the steamship line. They occurred through the acts of the seamen. The installation and presence of the asbestos on the ships, as the place of employment, was the last immediate and unfortunate event brought about by the PLI. The present case begs for the adoption of Judge Weinstein’s reasoning in Uniroyal Where there is an ongoing exposure by several claimants to a hazardous condition, some event other than the exposure should be the occurrence in order to avoid the injustice where a single condition causes hundreds of thousands of injuries constituting hundreds of thousands of occurrences.
In the present case, just as in Uniroyal, there are multiple events to choose from to define the occurrence. It could be the purchase of the asbestos by PLI, the overall presence of the asbestos on each ship, the overall presence of the asbestos on all ships, the initial exposure by each claimant, or the overall multiple exposure by each claimant. The latter two events equate the injury with the occurrence and should be rejected. Because the allocation of each policy per policy year requires a new deductible, it is only logical that the overall installation and presence on all ships should constitute a single occurrence.
In- Uniroyal, Judge Weinstein recognized that finding a single continuous occurrence is especially appropriate in cases involving mass deliveries of hazardous products that impose damage on large numbers of people. Uniroyal, 707 F.Supp. at 1384. Similarly, in Champion Int’l Corp. v. Continental Cas. Co., 546 F.2d 502 (2d Cir.1976), the Second Circuit found that 1,400 installations of defective paneling constituted only one continuous and repeated occurrence. Although the Stonewall decision cited by the majority distinguishes Champion’s single occurrence choice, Stonewall did hold that the installation of asbestos was the proper occurrence because it caused the asbestos exposure. Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1212-1213 (2d Cir.1995), modified on denial of reh’g, 85 F.3d 49 (2d Cir.1996). The Second Circuit in Stonewall and the majority reject Champion ’s analysis because Champion was the distributor of the defective product, whereas, Stonewall was the manufacturer and installer of the asbestos. Here,' however, PLI was simply the provider of a place of employment where the asbestos was installed. PLI was not the manufacturer or the installer. In addition, Stonewall related to damage to property; property damage lies in a totally different context from bodily injury incurred by the individual claimants.
In this case, however, applying the doctrine of most favorable construction for the insured makes the overall installation and presence the likely choice in the face of ambiguous policy language. Beyond this, it would seem that the common understanding, in the terms of the “average business man,” supports this rule. Furthermore, this approach is more equitable and manageable. *90 There is nothing in the policy or the law which contradicts it.
Such a result would certainly fall within the reasonable expectations of both the insured and insurer. Furthermore, this analysis does not depend on fictional hypothesis but rather on the actual experience involved here. The occurrence in this case was the continuing presence of the asbestos and is clearly separate from the injury encountered by the claimants’ exposure. In sum, common understanding of the term “occurrence” points to the underlying event rather than to the initial exposure (injury) by the worker.
II.
Plaintiffs’ utilization of the $300,000 reserve fund to recycle all payments (set up and approved by the bankruptcy judge as a part of the reorganization plan) provided only a momentary loss, but it was a loss. In 1969, Judge Mansfield observed:
[T]he courts of New York have repeatedly held that an insured fulfills his obligations under an indemnity policy and is entitled to reimbursement when a judgment against him has been satisfied, and the insurer may not escape its obligation to indemnify by showing that the payment made by the assured was advanced to it by a third party or financed in some other fashion.
Liman v. American S.S. Owners Mut. Protection & Indem. Ass’n, 299 F.Supp. 106, 109 (S.D.N.Y.1969), aff'd, 417 F.2d 627 (2d Cir.1969).[5]
The majority rejects plaintiffs’ plan of recycling payments to the claimants on the ground that plaintiffs’ arrangement was to finance “the whole of the claims, not the deductible alone.” The majority then reasons that “indemnity is sought for a loss that the policy holder has not incurred.” (emphasis added). Thus, the majority finds that plaintiffs’ non-recourse notes to the claimants is not a loss.
In all due respect, I fail to understand the proffered distinction. The payment of $300,-000, the satisfaction of judgments, along with the proffer of the non-recourse notes to each claimant constitutes a loss to the estate. It has created a new obligation to pay from existing estate funds certain sums of money. For example in Liman, the estate was able to pay all but $1,000 to each claimant. If it had been required to pay all 147 deductibles, it would not have had sufficient funds to pay any claims. Thus, the promissory notes in Liman were directly related to the estate’s ability to pay the various claimants. In addition in Liman, if all deductibles had been paid, the United States government would not have sufficient funds to protect its priority claims.
The majority reasons that “the insured’s lack of assets to satisfy claims against the bankrupt estate typically leaves the insured unable to sustain the loss and pay the claim.” The result of the majority’s decision is wholly inequitable; it allows a windfall to the insurer and denies any hope of payment to the injured worker. The financial plan created by Liman followed by the bankrupt estate mitigates this inequity and provides some partial relief.
By reducing each claim to a money judgment, the estate must obtain satisfaction of the judgment by proffering up to $300,000 to each claimant. When it has done that, the fact that the judgment creditor loans the monies back to the estate in exchange for a non-recourse note is not a sham. True, it is a contrived plan, but it was contrived in good faith with approval of the court.[6] Prudential *91 received no benefit from the plan. The note, albeit a non-recourse note, is a loss to the estate and can be filed in the estate as a claim against the estate, and depending upon the monies available, it will diminish the estate.[7]
Under this plan, each claimant (note holder) as a general creditor will still not be paid in full — but in this case, partial payment is better than nothing. Furthermore, what happens to the monies Prudential paid out should be of little concern to the indemnitor. There is no case that holds the plan is wrong;[8] equally, there is no case that holds on all fours that it is right. But the proposed plan is within the spirit of the law (finding a remedy for the right) and does not result in total forfeiture and a windfall to the Atneri-can Club,

. Judge Weinstein stated "[i]f the policy had defined the occurrence to be both the ‘event and the injury resulting therefrom,’ ” the result might have been different. Id. at 1380.

. In regard to the question of applying contra proferentum in the context of this case, I fail to see that PLI is not the insured in its relationship to the American Club simply because it also shares in a system of mutual insurance. PLI is not an insurance company and it does not act as a self-insurer as the insured did in Loblaw, Inc. v. Employers' Liab. Assurance Corp., 85 A.D.2d 880, 446 N.Y.S.2d 743 (N.Y.App.Div.1981), aff'd, 57 N.Y.2d 872, 442 N.E.2d 438, 456 N.Y.S.2d 40 (1982), the case cited by the majority. In its relationship with American Club its status is not “more akin to that of an insurance company than to that of an individual who is inexperienced in matters of insurance coverage for whose benefit the rule was promulgated.” Id. at 881, 446 N.Y.S.2d at 745. Furthermore, PLI’s mutual association with other steamship lines is irrelevant to the relationship of American who has insured PLI.

.I fully recognize American Home can be distinguished on the basis that its policy terms state that the occurrence is distinct from the injury. However, once again the American Club policy does not contradict these terms or expressly provide to the contrary. Because of such ambiguity, at the very least, the doctrine of reasonable expectation of the insured should apply.

. Judicial approval of the use of a promissory note as a means of payment to satisfy the "pay first” requirement of an indemnity policy can be found in early decisions throughout the country. For example, in Riner v. Southwestern Sur. Ins. Co., 85 Or. 293, 165 P. 684 (1917), the court stated that "[n]ol only the weight of precedent, but also the weight of reason, gives support to the doctrine that the making and delivery of a note may be a loss actually sustained.” Id. at 687 (listing cases which hold that the giving of a promissory note is a loss within the meaning of an indemnity policy).

. Cf. Taxicab Motor Co. v. Pacific Coast Cas. Co. of San Francisco, 73 Wash. 631, 132 P. 393 (1913), in which the insured under an indemnity policy satisfied a judgment against it through the use of a promissory note. The court observed:
[I]t will be remembered that the terms of the proposed payment and satisfaction were made known by the administratrix to the judge sit *91 ting in probate and received his sanction and approval before the settlement was made. It seems to us that this latter fact is alone sufficient to dispel any idea of bad faith that might arise from the transaction itself, and sufficient to require some direct and cogent proof of bad faith before it can be held that the transaction is not what it purports to be.
Id. at 395 (emphasis added).

. A note "has been held in numerous cases sufficient to constitute loss or damage under an indemnity against loss if that note is accepted as payment and in satisfaction of the judgment against the obligee.” Walker Mfg. Co. v. Dickerson, Inc., 510 F.Supp. 329, 332 (W.D.N.C.1980) (citing Seattle & S.F. Ry. & Navigation Co. v. Maryland Cas. Co., 50 Wash. 44, 96 P. 509 (1908); Kennedy v. Fidelity & Cas. Co. of New York, 100 Minn. 1, 110 N.W. 97 (1907)). As the Walker case observed these early state court decisions held that "execution of a note accepted as satisfaction for a judgment against the maker was a 'loss' sufficient to support recovery under an indemnity against loss, notwithstanding the possibility of the maker’s insolvency." Walker, 510 F.Supp. at 332.

. The majority cites two cases in support of its attempt to distinguish Liman from the present case: Ahmed v. American S.S. Owners Mut. Protection & Indem. Ass’n, Inc., 444 F.Supp. 569 (N.D.Cal.1978), aff'd in part, remanded in part, 640 F.2d 993 (9th Cir.1981); and Conoco, Inc. v. Republic Ins. Co., 819 F.2d 120 (5th Cir.1987). However, these cases are substantially different from the case before this court.
The majority cites Ahmed for the proposition that it distinguishes Liman because the insured in Ahmed "never paid any of the claims against it or arranged to finance such payments.” Ahmed, 444 F.Supp. at 572. Ahmed involved an attempt by an injured third party to maintain a direct action against a marine indemnity insurer after the insured shipping company became insolvent. The court held that New York law does not allow for such direct actions in the marine indemnity context. Ahmed, 444 F.Supp. at 572. It is obvious that when an injured third party attempts to directly sue the indemnity insurer that the insured will not have "paid any of the claims against it or arranged to finance such payments.” See id. However, in the present case, the insured did "arrange to finance such payments" through the recycling agreement and did in fact “pay the claims against it.” Therefore, the facts of the present case are not so easily distinguished from Liman as they are in the Ahmed decision.
The majority also cites Conoco in support of its proposition that the present case and Liman are distinguishable. In Conoco, an insolvent insured executed a demand promissory note, two years after its insolvency, in favor of the injured party claiming that the note was payment under the marine indemnity policy. Conoco, 819 F.2d at 121. The court held that the execution of the promissory note by the insured was not an actual expense and did not trigger the indemnity policy. Id. at 122-23. The facts of Conoco, however, are significantly different from the facts of the present case.
First, in Conoco, the injured party informed the insured that it would not attempt to collect on the promissory note. Id. at 121. There was no such assurance made by the claimants in this case. Second, the Conoco decision was supported by and decided under Texas law, not New York law. Id. at 123. Third, in Conoco, the insured was "completely bereft of assets” and "literally incapable of sustaining a loss.” Id. at 122. The insured corporation was also dissolved. This is not true here. In addition, the insured in Conoco “offered no hope of eventually providing any value at all in exchange for the note.” Id. at 123 (emphasis added). While Prudential may not have the assets to completely pay the full amount of claimants’ judgments, Prudential does have some assets (as evidenced by the $300,000 used in the recycling agreement) and is capable of sustaining a loss. Prudential does offer hope of providing some value for the non-recourse notes.