**In re PRUDENTIAL LINES, INC., Debtor.**

**Lee DICOLA, Trustee of the PLI Disbursement Trust, Plaintiff,**

v.

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., Defendant.**

Bankruptcy No. 86–11773.

Adv. No. 90–6830A.

United States Bankruptcy Court, S.D. New York.

Dec. 10, 1992.

---

L.C. Jaques, and A. Kellman, The Maritime Asbestosis Legal Clinic, Detroit, MI, for plaintiff-intervenors Asbestosis claimants ("Asbestosis claimants" or "claimants").

R.H. Brown, and J. Pratt, Kirlin, Campbell & Keating, New York City, for defendant American S.S. Owners Protection and Indem. Ass'n, Inc. ("American Club" or "Club").

## MEMORANDUM OF DECISION ON SUMMARY JUDGMENT AND
### 11 U.S.C. § 553

FRANCIS G. CONRAD, Bankruptcy Judge.*

Trustee commenced this declaratory action[1] under 28 U.S.C. §§ 2201, 2202 and

---

* Sitting by special designation.

1. Our subject matter jurisdiction over this con-

troversy arises under 28 U.S.C. § 1334(b) and

Federal Rules of Bankruptcy Procedure 7001(9) to determine coverage under various marine protection and indemnity insurance policies ("P & I policies"). The defendant, American Club, issued numerous P & I policies to the debtor, Prudential Lines, Inc. ("PLI"), during a business relationship that spanned more than forty years. Both parties have stipulated to the relevant facts and now move for summary judgment on all issues presented.

At least two issues presented here are of first impression in New York: whether injury-in-fact triggers coverage under a P & I policy in asbestos litigation and whether coverage under term P & I policies should be allocated pro rata among the various yearly insurance policies. We also address several other issues raised in the parties' motions for summary judgment: applicability of policy deductibles, Trustee's obligations under triggered P & I policies and the Plan's "Liman" provision to pay the Asbestosis Claimants before being indemnified by American Club, whether American Club is entitled to offset unpaid premiums against payments to the insured under different policies, and whether Trustee must pay interest accruing post-petition on pre-petition past-due premiums and assessments.

In the Memorandum of Decision that follows, we award summary judgment in favor of Asbestosis Claimants concerning the number and applicability of policy deductibles, the enforceability of the Plan's "Liman" provision, and interest accrued on past-due policy premiums and assessments. We award partial summary judgment to American Club on the setoff issue. Regarding the trigger issue, we reaffirm New York law that injury-in-fact during the policy period triggers coverage. Finally, we deny summary judgment on the issue of whether policy coverage should be allocat-

ed in proportion to the length of asbestos exposure.

## PROCEDURAL HISTORY

Creditors filed an involuntary petition against PLI under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* On November 4, 1986, PLI filed its consent to Entry of Order for Relief.

The Second Amended Joint Plan of Reorganization ("the Plan") was confirmed on October 4, 1990. The Plan created the PLI Disbursement Trust ("the Trust") under the PLI Disbursement Trust Agreement ("the Agreement"). According to the Agreement, the Trust was established to liquidate asbestos-related personal injury claims and to enforce the Trust's interests under PLI's numerous insurance policies. The Plaintiff in this action, Lee J. Dicola, as Trustee of the PLI Trust, currently holds all rights and interests of PLI in the Trust assets. These assets include various P & I policies drafted and issued by the Defendant, American Club, to PLI and its predecessors, Grace Lines, Inc., Prudential–Grace Lines, Inc., and Prudential Steamship Company (collectively, "PLI").

On December 14, 1990, Trustee commenced an adversary proceeding against American Club, PLI's insurer. Trustee seeks a declaratory judgment concerning various aspects of P & I policies issued by American Club to PLI. On April 2, 1991, we signed an order declaring the adversary proceeding to be a core proceeding and denying American Club's motion to abstain. This order was upheld on appeal to the United States District Court for the Southern District of New York.

By order dated February 26, 1991, Asbestosis Claimants were given permission to intervene in Trustee's adversary proceeding as the real parties in interest. On November 20, 1991, Asbestosis Claimants filed a motion for summary judgment. American Club filed its motion for sum-

the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). On April 2, 1991, we signed an order that the matter

sub judice is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by F.R.Bkrtcy.P. 7052.

mary judgment on November 21, 1991. In reference to their cross motions for summary judgment, the parties filed an Agreed Statement of Facts on November 21, 1991. Both parties have submitted memoranda of law and reply memoranda regarding the issues presented in the adversary proceeding.

On November 28, 1991, American Club moved under Federal Rules of Bankruptcy Procedure 4001 and 9014 for relief from stay to permit setoff of its unpaid premiums and assessments. We consider this motion in our discussion of the setoff issue, infra.

## FACTUAL BACKGROUND

PLI was a United States shipping company incorporated under Delaware law with its principal place of business in New York. PLI operated various shipping vessels and employed thousands of merchant marines during its years of operation. Following their employment on PLI vessels, a significant number of merchant marines developed asbestos-related diseases. These asbestotic injuries form the basis of the Asbestosis Claimants' personal injury action against PLI's insurer, American Club.[2]

American Club, a New York Corporation with its principle place of business in New York, is a nonprofit mutual insurance association of shipowners. American Club underwrote PLI's insurance policies from 1940 through 1970 and from 1975 through the early months of 1986. From 1971 through 1974, PLI belonged to another insurance club.

As insurer for PLI and other shipping companies, American Club issued yearly insurance policies to participating shipowners. According to the standard insurance agreement between American Club and participating shipping companies, each vessel was deemed to be a separate interest with separate insurance. Each vessel was insured by name according to tonnage and risk estimates.

American Club sold "assess" policies, meaning that the Club charged each participant its premium according to the amount necessary to cover claims and related expenses owed in the insurance year. After about ten years when it was assumed that the vast majority of claims were known and evaluated, the Club established a reserve to cover remaining unpaid claims. Once this reserve was created, the insurance year was officially closed and no further assessments were made. Unpaid reserve funds were distributed pro rata to American Club participants according to the premiums each participant paid in the relevant insurance year.

PLI failed to pay its insurance premiums to American Club during the 1979, 1983, 1984, and 1985 insurance years. In all other years in which PLI was a participant in American Club, PLI paid all premiums and assessments. For the purposes of the present declaratory judgment action, PLI and American Club have stipulated to the following amounts. First, the parties agree that the unpaid premiums, as reduced by refunds, equal a net principle balance of $1,270,980.82. Second, the accrued interest on this amount from the filing date of PLI's petition through June 15, 1991 is $350,814.94. The parties further stipulate that American Club owes Trustee $145,655.57, excluding interest, relating to other claims. Finally, Trustee contends that American Club owes an additional $216,304.62 relating to certain other claims.

The P & I policies at issue here contain standard terms and conditions which were identical in most respects from year to year.[3] The deductible amount under each

---

**2.** An order granting Asbestosis Claimants' motion to intervene was signed on February 21, 1991. The order also consolidated Trustee's objection to claim number 7760 with this adversary proceeding.

**3.** The relevant provisions of a sample policy from 1979 are as follows:

AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC. ... DOES INSURE _____ (Herein called collectively the Assured) ... IN THE INSURED SUM OF _____ DOLLARS at or from the 20th day of February 1979, at noon, Greenwich Mean time until the 20th day of February 1980 at noon, Greenwich Mean time against the risks

of the P & I policies, varied, however, according to the year the policy was issued. In the 1940s and 1950s, deductibles ranged from $500 to $1,000 per occurrence. During the 1960s and 1970s, deductibles ranged from a low of $2,500 to a high of $100,000 per occurrence. Until 1989, it was American Club's practice to apply one deductible for each policy year.

Policy limits also varied in the applicable insurance years. Typically, policy limits were $2,000,000 in the 1940s and $5,000,000 in the 1950s. This amount increased throughout the 1960s and 1970s to $10,000,-000. In the early 1980s, the stated policy limit was $100,000,000.

Asbestosis Claimants, composed of more than 5000 individuals, have filed more than 7000 claims in PLI's bankruptcy. The Asbestosis Claimants seek damages for their injuries on the grounds of negligence under the Jones Act, 46 U.S.C. § 688, *et seq.*, and on the grounds of unseaworthiness under the General Maritime Law. Each claimant has alleged employment on one or more PLI shipping vessels at some time between 1940 and early 1986, when PLI left the American Club. Claimants contend that their exposure to asbestos on PLI ships has resulted in various forms of asbestotic disease. Most claimants also worked aboard non-PLI vessels during the time period above.

The negative health effects of asbestos exposure have been well documented for decades. The parties have stipulated in the Agreed Statement of Facts that inhaling asbestos causes physical injury. Once inhaled, asbestos causes a variety of respiratory diseases whose manifestations occur with the passage of time. These diseases include mesothelioma, pleural abnormalities, and interstitial fibrosis.

## DISCUSSION

This declaratory judgment action seeks to resolve the legal uncertainties surrounding insurance coverage when a toxin previously assumed safe for use later proves harmful or fatal to humans. As in cases involving exposure to lead, Agent Orange, and PCBs, exposure to asbestos frequently predates manifestation of the resulting disease by more than a generation. With this in mind, we begin our analysis of the parties' respective positions in the light of the applicable law.

We have jurisdiction under Federal Rules of Bankruptcy Procedure 7001(9) to determine the rights and duties of the parties by declaratory judgment if there is an "actual controversy." See, 28 U.S.C. § 2201. The test of justiciability under this statute is "... whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The present adversary proceeding satisfies these requirements.

The dispute between American Club and Asbestos Claimants hinges on the construction of maritime P & I policies. P & I policies originated in England in the nineteenth century after a court decision held that hull underwriters were not liable for payment of the liabilities of the insured owner or his vessel arising out of negligence. *De Vaux v. Salvador*, 111 B.R. 845

and subject to the terms and conditions hereunder set forth in respect of the vessel ...

\* \* \* \* \* \*

THE ASSOCIATION AGREES TO INDEMNIFY THE ASSURED AGAINST ANY LOSS, DAMAGE OR EXPENSE WHICH THE ASSURED SHALL BECOME LIABLE TO PAY AND SHALL PAY BY REASON OF THE FACT THAT THE ASSURED IS THE OWNER ... OF THE INSURED VESSEL AND WHICH SHALL RESULT FROM THE FOLLOWING LIABILITIES, RISKS, EVENTS, OCCURRENCES AND EXPENDITURES:

(1) LIABILITY FOR LIFE SALVAGE, LOSS OF LIFE OF, OR PERSONAL INJURY TO OR ILLNESS OF ANY PERSON ... LIABILITY HEREUNDER WITH RESPECT TO A MEMBER OF THE CREW SHALL INCLUDE LIABILITY ARISING ASHORE OR AFLOAT.
This liability is then subject to five conditions, including the following:
(e) Claims hereunder, other than for burial expenses, are subject to a deduction of $___ with respect to each accident or occurrence.

(1836). After the *De Vaux* decision, insurers, including Lloyds of London, offered a new form of marine insurance that provided indemnification for prescribed losses during a fixed term. The new type of policy insured against risks over a given time period; such policies became known as "time" policies. P & I policies are a subset of time policies. Routinely, P & I policies protect shipping companies against liabilities arising from ownership of a particular ship during a given year. See, Parks, *The Law and Practice of Marine Insurance and Average,* vol. 1 (Cornell Maritime Press 1987).

The historical distinction between "protection" and "indemnity" risks is relevant in considering the scope of the modern P & I policy. Protection risks include loss of life, personal injury, collision liabilities, and damage to piers. Indemnity risks involve damage to and loss of cargo as well as fines and penalties. More than a century ago, the two classes of risks were insured in separate mutual associations. Today, they are insured together in the typical P & I policy. Parks, *The Law and Practice of Marine Insurance and Average,* supra, 843. Historical support therefore exists for the position that P & I policies offer more comprehensive coverage than pure indemnification policies.

▬▬ A P & I policy is a maritime contract. The Admiralty Clause of the United States Constitution renders the construction of a maritime contract a matter of federal law. *Wilburn Boat Co. v. Fireman's Ins. Co.,* 348 U.S. 310, 313, 75 S.Ct. 368, 370, 99 L.Ed. 337 (1955). A federal court sitting in admiralty must apply federal choice of law rules. *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 414, 1991 A.M.C. 1147 (2d Cir.1990). The United States Supreme Court has held that in the absence of a controlling federal law, the scope and validity of marine insurance policies are

determined under state law. See, *Wilburn Boat Co., supra.*

The parties agree that to the extent that federal admiralty rules do not exist, the interpretation of the relevant insurance policies is governed by New York law. The facts surrounding the dispute support this conclusion. American Club drafted and issued the P & I policies in New York. The parties also negotiated the insurance policies in New York. New York is therefore the jurisdiction with the most significant nexus with the insurance contract. See, *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld, supra,* 921 F.2d at 414.

Both American Club and Asbestosis Claimants have moved for summary judgment on the issues of insurance contract interpretation raised by Trustee in the declaratory judgment action. On cross motions for summary judgment, the court must determine whether one of the parties is entitled to judgment as a matter of law on the basis of the undisputed facts. *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687, 694 (Bankr.S.D.N.Y.1992) (citation omitted).

The standards for summary judgment are well known. To prevail in a motion for summary judgment, the movant must satisfy the criteria set forth in Fed.R.Civ.P. 56,[4] as made applicable to this Court under F.R.Bkrtcy.P 7056. The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when no genuine issue of material fact is in dispute.

The function of this court when considering a motion for summary judgment is not to resolve disputed issues of fact but to determine whether there is a genuine issue to be resolved. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, in determining whether a genuine issue has been raised, a court must resolve all ambiguities

---

4. Rule 56 provides in part: "[T]he judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Eastman Machine Company, Inc. v. United States,* 841 F.2d 469 (2d Cir.1988).

and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (per curiam). Therefore, not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them. *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 57 (2d Cir. 1987); accord, *Anderson v. Liberty Lobby, Inc., supra.*

The burden is on the party moving for summary judgment to establish the absence of any genuine issue of material fact. *Federal Deposit Ins. Corp. v. Bernstein*, 944 F.2d 101, 106 (2nd Cir.1991), citing, *Anderson v. Liberty Lobby, Inc., supra.* Any ambiguities must be resolved in favor of the non-movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986). Speculation and conjecture are insufficient. Only after the moving party has met its initial burden must the opposing party set forth specific facts showing that there is a genuine issue for trial and that the disputed facts are material.

■ The starting point in interpreting an insurance policy is to determine whether the policy terms are ambiguous. Whether or not an insurance contract is ambiguous is a matter of law. *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263, 3 U.C.C.Rep.Serv.2d 1885 (2d Cir.1987). As a general rule, plain or unambiguous language will be given its ordinary meaning and effect, and the need to resort to rules of construction arises only when an ambiguity exists. *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 306, 1988 A.M.C. 223 (2nd Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988) (citations omitted).

■ If the policy is ambiguous, New York law applies the following rules of construction. An ambiguous insurance contract will generally be construed against the insurer who drafted it in order to promote coverage to which the policy relates. This principle applies to all types of insurance contracts, including maritime policies. *Ingersoll Mill. Mach. Co. v. M/V Bodena, supra*, 829 F.2d at 306 (citations omitted).

■ An insurance contract must be construed to effect the intent of the parties as expressed by their words and purposes. *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), aff'd as modified, 748 F.2d 760 (2d Cir.1984) (*"AHP"*). The construction of ambiguous provisions must not be inconsistent with the plain meaning of the language or the parties' obvious intentions. *AHP*, 565 F.Supp. at 1492. When the meaning or applicability of particular words and phrases are at issue, the policy must be viewed from the vantage point of the "reasonable expectations and purposes of the ordinary businessman." *Avondale Indus., Inc. v. Travelers Indem. Co.*, 697 F.Supp. 1314, 1319 (S.D.N.Y.1988), aff'd, 887 F.2d 1200 (2d Cir.1989), cert. denied, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990).

■ Moreover, if a contract or its terms appear ambiguous, the burden is on the insurer to establish that the construction it seeks is the only reasonable interpretation of the policy language. *Vargas v. Insurance Co. of North America*, 651 F.2d 838, 840 (2d Cir.1981). In resolving an ambiguity, the court must look to extrinsic evidence for aid in ascertaining the parties' intent if the insurer's construction of the policy is reasonable. *Uniroyal Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1374–5 (E.D.N.Y.1988) (*"Uniroyal"*). If such extrinsic evidence raises an issue of credibility, then it is an issue of fact for the factfinder. *Uniroyal*, 707 F.Supp. at 1374. If there is no material extrinsic evidence, *Carvel Corp. v. Rait*, 117 A.D.2d 485, 503 N.Y.S.2d 406, 409 (N.Y.A.D.2d Dept.1986) or if such evidence fails to raise credibility or present a choice among reasonable inferences, it is a case for construction by the court as a matter of law. *Alfin, Inc. v. Pacific Ins. Co.*, 735 F.Supp. 115, 119 (S.D.N.Y.1990). In this event, "the court must follow the rule of *contra proferentum* to construe any ambiguities against the insurer drafter." *Uniroyal*, 707

F.Supp. at 1376; See, *Stonewall Ins. Co. v. National Gypsum Co.*, 1992 WL 123144 (S.D.N.Y.1992) (not reported in F.Supp.).

In the parties' cross motions for summary judgment concerning insurance coverage, two aspects of "ambiguity" appear to be in conflict: ambiguity in an insurance contract that may render summary judgment improper as a matter of federal procedure and ambiguity in an insurance contract that must be construed by the court as a matter of substantive state contract law. Federal procedure under Rule 56 states that ambiguities are to be resolved following a full presentation of extrinsic evidence to the factfinder, whereas New York's substantive law requires that ambiguities be reasonably construed against the insurer. Other courts addressing this legal dilemma have ruled that summary judgment is proper on an ambiguous insurance policy when, after having allowed full discovery and found no valuable extrinsic evidence of the parties' intent, the court applies the state law presumption construing the policy against the insurer. *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1373–78 (E.D.N.Y.1988). However, issues involving unambiguous insurance provisions are ripe for disposition in a motion for summary judgment. We follow the above rules in the matter now before us.

I. Coverage Trigger

The first issue before us concerns the triggering of coverage under the relevant P & I policies. As a threshold matter, we hold that the insurance policies relevant here are not ambiguous concerning the trigger issue. The issue is therefore proper for summary judgment.

The P & I policies at issue here provide that the duty to indemnify is based on "liability for ... personal injury...." The parties agree that asbestosis constitutes actual injury and is a disease compensable under the P & I policies. The parties disagree, however, concerning when liability arose and whether the progressive nature of the disease triggers liability under subsequent policies covering periods after initial exposure.

Not surprisingly, the insurer advocates a less expansive interpretation of policy coverage. American Club argues that its obligation to indemnify arises when asbestos causes real injury during the policy period. According to the parties' stipulation of facts, this real injury occurs at exposure. American Club also states that when a merchant marine is exposed to asbestos on more than one ship, the second policy is also triggered. American Club's position is referred to as the "exposure theory." See, *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980), modified on rehearing, 657 F.2d 814 (6th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

Asbestosis Claimants agree that the exposure theory may be applicable here. Asbestosis Claimants, however, also argue in favor of "exposure in residence," a more comprehensive theory of coverage in which all subsequent PLI policies are triggered following the initial exposure to asbestos, even policies covering vessels on which the injured never worked and policies issued for periods when the injured did not work for PLI. Citing *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034 (D.C.Cir. 1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) ("*Keene*"), Asbestosis Claimants argue that all policies in force during the continuous bodily injury process, from first exposure to asbestos through manifestation of the asbestos-related disease, must indemnify PLI in full to the applicable policy limit for all asbestos-related personal injuries and lawsuits against PLI. Asbestosis Claimants base their argument on the continuous progression of asbestos-related disease after initial exposure and what they term the "result-oriented" language of the P & I policies.

Trigger is often the fundamental issue in asbestosis litigation because the insurer at the triggering event becomes obligated to

provide coverage under the terms of the insurance contract. Although widespread asbestosis litigation has created numerous decisions in the last few years concerning comprehensive general liability ("CGL") policies,[5] there is unfortunately little if any case law regarding what triggers P & I coverage. CGL policies provide coverage that is admittedly broader than their P & I policy cousins. We believe, however, that the similarities outweigh the differences in matters concerning the trigger issue. We therefore seek guidance from recent decisions in which fellow courts have interpreted CGL policies under New York law in light of personal injury claims for asbestosis.

■■■■■ The plain language of the P & I policies at issue here forms the starting point of our analysis. The policies list fifteen liabilities that are covered by the insurer, including the following relevant provisions:

> The Association agrees to indemnify the assured against any loss, damage or expense which the assured shall become liable to pay and shall pay by reason of the fact that the assured is the owner ... of the insured vessel and which shall result from the following *liabilities, risks, events, occurrences* and expenditures:
>
> (1) *Liability* for life salvage, *loss or life of,* or *personal injury* to or illness of any person ... arising ashore or afloat [emphasis ours].

Liability is a broad legal term that generally is defined as all debts and obligations arising under law, whether contingent or absolute, express or implied. This is not an ambiguous term. See, *Eagle Leasing Corp. v. Hartford Fire Ins. Co.,* 540 F.2d 1257 (5th Cir.1976). Similarly, personal injury is a term with only one reasonable interpretation: a damage done to a man or woman's person, as distinguished from an injury to property or reputation.

■■ Each P & I policy also states the period of the coverage. For example, the 1979 policy provides

> American Steamship Owners Mutual Protection and Indemnity Association, Inc. ... does insure ____ [the Assured] ... in the insured sum of ____ Dollars at or from the 20th day of February 1979, at noon, ... until the 20th day of February 1980 at noon ...

The time period of the above policy is clearly unambiguous. Reading the words "liability" and "personal injury" coupled with the yearly policy term, we conclude that liability for personal injury arising during the policy term triggers coverage. We believe that this interpretation best reflects the parties' intent as expressed by their words and purposes.

Asbestosis Claimants' interpretation of the P & I policies errs in several respects. Claimants state that according to the language of the policy, American Club agreed to indemnify PLI "against any loss, damage or expense ..." On the basis of this language, Claimants argue that American Club undertook the obligation to indemnify PLI for all asbestos-related injuries following the initial exposure, regardless of whether injured seamen continued to serve on PLI vessels. Asbestosis Claimants also argue that New York law requires that the policy be construed to maximize coverage. We believe, however, that Asbestosis Claimants' position misconstrues the general rules of insurance law and contractual interpretation applicable here.

At the most basic level, the P & I policies that PLI purchased were yearly contracts for indemnification for losses and damages arising from the ownership and operation of a ship during the policy period. If we were to accept the Claimant's interpretation of continuous trigger, the yearly term of the policy would become meaningless. The essence of the agreement was indemnification for losses and liabilities arising during the stated term of the contract. In contrast, Asbestosis Claimants' construc-

---

**5.** The comprehensive general liability policy is a standard form insurance policy that was introduced by the insurance industry in the mid– 1960s. The policy was designed to provide liability coverage for injuries caused over a period of time.

tion of the P & I policies would provide perpetual coverage without payment of premiums, an actuarial nightmare in an insurance situation in which the premiums and deductibles were recomputed annually. We believe that the terms of policies should be construed to give the insurance contract a reasonable meaning that most clearly reflects the probable intentions of the parties.

On the basis of our own research, we find that federal courts applying New York law adopt the "injury-in-fact" theory as triggering coverage under a CGL policy. See, *Maryland Casualty Co. v. W.R. Grace & Co.*, 794 F.Supp. 1206 (S.D.N.Y. 1991) (and cases cited therein). The injury-in-fact theory was first advanced in *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y. 1983), aff'd as modified, 748 F.2d 760 (2d Cir.1984) (*"AHP"*). In *AHP*, Judge Sofaer held that actual injury during the relevant policy period triggers coverage under New York law. In other words, at the time an injury actually occurs, the applicable policy is, in effect, triggered. It is of no consequence whether the injury has been discovered or not. According to AHP, "a real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, irrespective of the time the injury became [diagnosable]." *AHP*, 748 F.2d at 766 (quoting *AHP*, 565 F.Supp. 1485, 1497 (S.D.N.Y.1983). Applying the above standard to P & I policies, we hold that injury-in-fact during the policy period triggers coverage.

Asbestosis Claimant's request that we apply exposure in residence (continuous trigger) to the facts of this case is without merit. Continuous trigger has been explicitly rejected in New York in several courts. In *AHP*, the court rejected *Keene* as "result-oriented" and ruled that "[r]elying on social policy to justify imputing an expecta-

tion of complete coverage to the insured is ... legally insupportable." *AHP*, 565 F.Supp. at 1511. The District of Columbia Circuit, the court that decided *Keene*, has also rejected the application of *Keene's* continuous trigger in cases applying New York law. In *Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119 (D.C.Cir.1986), the D.C. Circuit found the *Keene* decision "inconsistent" with *AHP* and New York's injury-in-fact standard.

Although we note that Asbestosis Claimants' continuous trigger theory has support in other jurisdictions,[6] New York clearly applies the injury-in-fact trigger to cases involving exposure to hazardous substances like asbestos. Moreover, our research finds that recent New York decisions concerning the trigger issue, including *Stonewall Insurance Co. v. National Gypsum Co.*, 1992 WL 123144 (S.D.N.Y. 1992), also support the injury in-fact-theory. There is ample support for our conclusion that exposure to asbestos and accompanying injury-in-fact during any of the relevant policy periods triggers coverage under the applicable P & I policies. See, *Maryland Casualty Co. v. W.R. Grace & Co.* and *AHP*, supra (and cases cited therein).

The parties agree that exposure to asbestos causes physical injury. It is also a matter of law that injury-in-fact in the form of tissue damage occurs simultaneously or soon after asbestos inhalation.[7] See, *Insurance Co. of North America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1222 (6th Cir.1980), modified on rehearing, 657 F.2d 814, cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). We therefore need not decide when injury-in-fact occurs.

Applying the injury-in-fact trigger to the facts of this case, we note that multiple policies may be triggered for some claim-

6. See, *D'Aiante du Quebec, Ltee. v. American Home Assurance Co.*, 613 F.Supp. 1549 (D.N.J. 1985), vacated, 864 F.2d 1033 (3d Cir.1988).

7. See, Agreed Statement of Facts, page 8. In their briefs to the Court, both parties state that injury from asbestos occurs immediately or shortly after exposure. This view coincides

with several court decisions concerning the issue, including *Insurance Co. of North America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980), modified on rehearing, 657 F.2d 814, cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

ants. Typically, PLI employed merchant marines on a given ship for intervals of several weeks, after which time many worked on other PLI ships or for other shipping companies. Over the course of a merchant marine's employment, exposure to asbestos may have occurred on numerous vessels owned by various shipping companies. If a seaman were exposed to asbestos on more than one ship during any of the ships' insurance years, then more than one P & I policy would be triggered for that individual claimant. When PLI purchased a P & I policy from American Club, it purchased insurance for losses arising during the one-year term of the insurance contract. Nothing in the policies states that future P & I policies would be triggered for injuries occurring outside the coverage period. The terms of each policy speak for themselves.

New York law requires that we construe the P & I policy as a whole according to the reasonable businessperson standard. *Avondale Indus., Inc. v. Travelers Indem. Co., supra,* 697 F.Supp. 1314, 1319. We are not at liberty to alter the terms of the parties' agreement under the guise of contractual construction. Although it is true that courts construe ambiguous language against the insurer, we find no ambiguity in the policy regarding the trigger issue. In the light of the yearly term of each P & I policy relevant here, it is unreasonable that subsequent policies would be triggered for losses arising from a prior insurance period. The language of the policy provides that liability arising during the contract term triggers coverage. Rewriting the policies to require indemnification for losses occurring outside the policy period would violate this state's rules of construction as well as New York's general rule that injury-in-fact during the policy term triggers coverage.

## II. Coverage Allocation

The second issue before us concerns allocation of coverage. The allocation issue flows from the fact that numerous exposed PLI seamen worked on more than one PLI ship during various insurance

years. Given the fact that exposure occurred on different ships and therefore under different policies, the parties request a determination of whether liability should be allocated among or between the policies when more than one policy is triggered.

American Club argues that its duty to indemnify should be allocated pro rata according to each claimant's sea service and exposure on PLI and other insured vessels. The Club bases its position in part on the "other insurance" clause found in the relevant P & I policies. Under this theory, if more than one policy is triggered, the Club need indemnify PLI only to the extent that exposure occurred on any given insured ship during its policy period. All triggered policies would then contribute to indemnify PLI for amounts paid according to the amount of time a particular seaman spent on PLI vessels as a proportion of the time he was exposed to asbestos. Each triggered policy would contribute in proportion to its policy limit to indemnify Trustee for the loss.

Asbestosis Claimants argue that American Club is liable under each and every triggered policy to the extent of coverage, without allocation. In sum, Asbestosis Claimants request that we apply joint and several liability to all policies. Claimants cite several cases that support their position, none of which concern New York law or P & I policies.

To our knowledge, no other court has resolved a similar issue of allocation within the marine insurance setting. We therefore begin our analysis with the plain meaning of the relevant policy provisions. The P & I policies provide that American Club "agrees to indemnify [PLI] against any loss, damage or expense which [PLI] shall become liable to pay ..." Each P & I policy is thus triggered by the loss, damage, or liability during the applicable term of the policy. It follows that when American Club becomes liable during a policy for a claimant's asbestos injury (the injury in fact), "any loss" attributable to that liability must be indemnified under the policy according to applicable deductibles and policy limits.

As noted earlier, PLI seamen often worked on more than one vessel, sometimes even in the same calendar year. It is therefore probable that many seamen were exposed to asbestos on more than one vessel during the same or different policy years. Whether this additional exposure contributed to further injury or exacerbated earlier injury is an unresolved question of fact. This uncertainty gives rise to the issue of whether coverage under triggered policies should be allocated so that coverage mirrors exposure periods and therefore the severity of injury. American Club advocates allocation that would base payment for a given injury on the length of time that an individual was exposed to asbestos, relative to exposure on other ships during the same or other insurance years.

According to Asbestosis Claimants' theory, when a seaman is exposed to asbestos on a PLI vessel during one year and then is exposed to asbestos on non-PLI vessels during subsequent years, American Club would become jointly and severally liable to pay all damages flowing from the exposures on all vessels. In addition, if the seaman served on PLI vessels for a continuous span of years, in any given insurance year PLI could incur liability for all the claimants' asbestos-related damages.

In New York, losses covered by more than one insurance policy are sometimes allocated to each triggered policy according to the proportion of the estimated injuries occurring under each policy. *Uniroyal, supra*, 707 F.Supp. at 1392. The courts in New York generally hold that each excess policy must contribute in proportion to its limit amount of insurance. *Hausman v. Royal Ins. Co.*, 153 A.D.2d 527, 544 N.Y.S.2d 605, 607 (N.Y.A.D. 1st Dept.1989); *Hospital Underwriters Mutual Ins. Co. v. National Casualty Co.*, 150 A.D.2d 636, 541 N.Y.S.2d 512, 513 (N.Y.A.D.2d Dept. 1989).

The special facts of this case, however, dictate that we not follow *Uniroyal* here. In contrast to the facts in *Uniroyal*, each Club policy was a separate indemnity contract covering losses during a particular term. In the early years of the parties'

business relationship, most policies insured one named vessel during a one-year period. In later decades, it was common for American Club to issue a single yearly policy for all ocean-going ships. In both cases these policies were not interrelated except to the extent provided in the "other insurance" clause.

■ We interpret the other insurance clause to refer to concurrent policies that PLI may have carried that also covered losses occurring during the term of a triggered P & I policy. The clause is therefore inapplicable to other P & I policies issued to insure the same or other vessels during different insurance periods. For example, if PLI carried two P & I policies on the same vessel for the same insurance year, then the other insurance clause would become relevant. To the best of our knowledge, we are not presented with that situation here.

Without language that mandates allocation, we find little support for American Club's position. We therefore hold that American Club is liable under each P & I policy for the entire injury sustained during a triggered policy period. Our holding, however, is subject to one limitation.

Under the special facts and circumstances of this case, some fair and appropriate means of allocation may be used if evidence presented at trial can specifically identify and quantify the actual injury sustained during a given policy period relative to other triggered policies. If medical evidence cannot differentiate between or among known exposures and their resulting injuries, as we suspect, then each triggered policy shall be liable for the full amount of the claim up to its stated policy limit. In these circumstances, the liability of each insurer would be joint and several. If evidence, however, is able to identify and quantify the extent of injury during a given policy period, then, subject to policy limits, deductibles, and "other insurance" clauses, each triggered policy must respond to the claimant's losses according to an estimate of the damages occurring during the policy term in proportion to the policy limit of each P & I policy. See, *Sandoz*,

*Inc. v. Employer's Liability Assurance Corp.*, 554 F.Supp. 257 (D.N.J.1983).

Our holding rejects the automatic pro rata allocation adopted in *Insurance Co. Of America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980), aff'd on rehearing, 657 F.2d 814 (1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) ("*Forty Eight*") in a claim by the insured. *Forty Eight* may be an appropriate standard when considering claims among the insurers, but not when considering a claim by the insured. We instead seek to avoid an arbitrary pro rata method based on the assumption that bodily injury reflects asbestos exposure in a linear fashion. We have no facts with which to make this determination, and thus the issue is inappropriate for summary judgment.

▬ American Club is liable under each P & I policy to indemnify for damages flowing from exposure during policy periods. An accurate determination of when injury occurred will require evidence on the progress of the disease. If medical evidence can establish the timing of injury, each policy will be liable only for damages occurring during the policy period. The liability under a given P & I policy would not be affected by the existence or nonexistence of prior or subsequent coverage. The parties' respective motions for summary judgment on the issue of allocation are therefore denied.

### III. Policy Deductibles

▬ In the third issue presented, the parties request a determination concerning the application of policy deductibles. The deductible clause in the relevant P & I policies provides "(e) Claims hereunder ... are subject to a deduction of $___ with respect to each accident or occurrence." The terms "occurrence" and "accident" are not defined within the four corners of the P & I policies.

Asbestosis Claimants suggest that we adopt a definition of occurrence analogous to that found in CGL policies, in which occurrence is generally defined as "an accident, including injurious exposure to conditions, which results, during the policy peri-od, in bodily injury ..." *Abex*, 790 F.2d at 122; *American Motorists Ins. Co. v. E.R. Squibb & Sons, Inc.*, 95 Misc.2d 222, 406 N.Y.S.2d 658, 660–61. Under this construction, Claimants argue that the condition of asbestos on all PLI vessels is a single occurrence. Claimants then conclude that there is a single deductible per policy, regardless of the number of asbestos claims filed against a given policy.

American Club offers a narrower interpretation of occurrence. According to the Club, each individual exposure to asbestos constitutes a separate occurrence. The Club concedes, however, that it is reasonable to construe the term occurrence to mean that "the total exposures of the seaman throughout the policy year are considered one accident or occurrence, regardless of the number of voyages or vessels involved." Under this interpretation, each seaman's claims would be subject to one deductible. We believe this interpretation, however, improperly equates the words "claim" and "occurrence."

The Club also asserts that CGL policies are inapplicable in the present dispute because they are based on an expanded definition of occurrence. Instead, the Club asks us to construe occurrence in accordance with the "unfortunate event" test applied in *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1975). The unfortunate event test states that there is one accident or occurrence if there has been but a single "event of an unfortunate character that takes place without one's foresight or expectation." We are uncertain, however, of the benefit to the Club's position if we were to accept the unfortunate event test. In *Wesolowski*, the New York Court of Appeals held that a multiple-car accident constituted one continuous event or occurrence for purposes of calculating an insurance deductible. Applying this test to the present case, it is reasonable to conclude that the presence of asbestos on PLI vessels constituted one continuous unfortunate event, thus constituting one occurrence and the application of only one deductible. If anything, the *Wesolow-*

*ski* holding supports Asbestosis Claimants' position, not that of American Club.

■ American Club also argues that the words "claims hereunder" mandate that we apply the deductible to each claim rather than each occurrence. We disagree. The words "claims hereunder" merely mean that the deductible applies to claims filed under that particular P & I policy. They do not void subsequent language that makes the deductible applicable to "each accident or occurrence." See, *Export S.S. Corp. v. American Ins. Co.*, 35 F.Supp. 422, 424 (S.D.N.Y.1940).

Finally, American Club suggests that we apply the practice of the Club's Board of Directors and apply the deductible per asbestos claimant. Although the Club's practice is certainly relevant in construing an ambiguous provision, we find the deductible clause unambiguous and plain on its face. We therefore cannot look to circumstances external to the contract. *AHP*, supra, 565 F.Supp. at 1500. In addition, evidence from a particular course of dealing can be misleading, especially when construing insurance contracts covering liability for insidious diseases. *AHP*, 565 F.Supp. at 1503.

■ American Club's contention that calculation of the number of occurrences turns on the number of claims is not supported by New York law. It is well settled that in determining the number of occurrences for deductibles, the focus should be on "the underlying circumstances which resulted in the claim for damages" rather than on the number of persons injured. *Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 506 (2d Cir.1976), cert. denied, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977) ("*Champion*"). The law of New York defines occurrence as the underlying event that ultimately results in a filed claim or claims. A claim and an occurrence are conceptually different terms. See, *Uniroyal*, supra, 707 F.Supp. at 1382–83.

Several courts applying New York law have concluded that in mass toxic tort exposure cases all exposures to the harmful substance constitute one occurrence when determining applicable deductibles. In *Uniroyal*, supra, Judge Weinstein applied the definition of occurrence found in a CGL policy to claims based on exposure to Agent Orange, a defoliant widely used in Vietnam. *Uniroyal* held that the delivery of Agent Orange to the United States military constituted a single occurrence, regardless of the number of actual deliveries, the number of times the chemical was sprayed in Vietnam, or the number of soldiers exposed to the substance. *Uniroyal*, 707 F.Supp. at 1382–83. *Uniroyal* strongly supports Asbestosis Claimants' position that the presence of asbestos on PLI vessels was a single event or occurrence.

Also, in *Champion*, supra, the court construed a CGL policy similar in form to the policy interpreted in *Uniroyal*. The court held that providing for deductibles "per occurrence" rather than "per claim" evidenced an intent to afford coverage not on the basis of individual claims, but rather on the underlying circumstances which resulted in the claim for damages. *Champion*, 546 F.2d at 505–6. Accordingly, the Second Circuit held that Champion's sale of vinyl-covered paneling to vehicle manufacturers, precipitating the damage claims of 1,400 consumers, constituted a single occurrence. *Id.* at 506.

The holding expressed in *Champion* is by no means atypical and finds support in other jurisdictions. For example, in *Transport Insurance Co. v. Lee Way Motor Freight*, 487 F.Supp. 1325, 1330 (N.D.Tex. 1980), the court stated:

[t]he great majority of courts have held that where a single event, process or condition results in injuries, it will be deemed a single occurrence even though the injuries may be widespread in both time and place and may effect a multitude of individuals.

Our review of additional caselaw supports this conclusion. See, *Stonewall Ins. Co. v. National Gypsum Co.*, 1992 WL 123144 (S.D.N.Y.1992) (not reported in B.R.).

In the light of the above decisions, we conclude that a court should look to the underlying event rather than individual

claims when defining an occurrence. The test in New York for determining what constitutes this underlying event or occurrence was first set forth in *Authur A. Johnson Corp. v. Indem. Ins. Co.*, 7 N.Y.2d 222, 196 N.Y.S.2d 678, 164 N.E.2d 704 (1959). In that opinion, the New York Court of Appeals analyzed prior case law and distinguished three classes of decisions. The first class of decisions found a separate accident for each negligent act or omission; the second class of cases found a separate accident for each injury; and the third group of cases found a separate accident for each "event of an unfortunate character." *Johnson*, 196 N.Y.S.2d at 683, 164 N.E.2d at 707. After weighing the merits of each case, the Court of Appeals adopted the "unfortunate event" test for determining what constitutes an accident. This test, the Court concluded, "corresponds most closely with what the average person anticipates when he buys insurance and reads the accident limitation in the policy." *Johnson*, 196 N.Y.S.2d at 684, 164 N.E.2d at 708. Similarly, in *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973), the Court of Appeals applied the "unfortunate event" test to "occurrence" as well as "accident."

The parties offer little evidence concerning the meaning they attach to the term "occurrence." Although we find the term unambiguous, we note that if we were to conclude that "occurrence" is ambiguous, we would construe the ambiguity in a manner that favors the insured and permits recovery, so long as the construction is reasonable. *Uniroyal*, 707 F.Supp. at 1377; *Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 389 N.Y.S.2d 565, 567, 358 N.E.2d 258, 260 (1976); *Ideal Mutual Ins. Co. v. Last Days Evangelical Association*, 783 F.2d 1234, 1238 (5th Cir.1986). Applying this presumption given the plain meaning of the policies, we conclude that the occurrence was the presence of asbestos on each PLI vessel during each triggered policy period. We therefore hold that each P & I policy obligated to indemnify will be able to claim one deductible, irrespective of the number of claims filed against an individual policy.

The fact that numerous claims have been filed against American Club necessitates that we discuss the Trust's liability, as successor to PLI's interests, for applicable deductibles. We believe that the one deductible owing under each triggered policy should be allocated among all claimants according to the percentage that each claim takes relative to the policy limit. For example, if an individual receives 3% of the policy limit as compensation for his asbestos related injuries, the Trust will be responsible for 3% of the deductible amount for the underlying occurrence. Allocation of deductibles will apply for each policy regardless of whether coverage is allocated based on multiple exposure or whether coverage is based on joint and several liability.[8]

Our holding concerning allocation of deductibles is supported by the plain language of the relevant P & I policies. Each policy applies a deductible "with respect to each accident or occurrence." To adopt American Club's position, we would have to rewrite the deductible clause to require a deductible for each claim. We are not at liberty, however, to adopt a construction of an insurance policy that is inconsistent with the contract's plain meaning. *AHP*, 565 F.Supp. at 1492. In providing for deductibles "with respect to each occurrence," we conclude that the parties intended that the deductible apply for each underlying event, rather than per claim. See, *Champion International, supra*, 546 F.2d at 505. Accordingly, we find the deductible clause unambiguous and award summary judgment in favor of Asbestosis Claimants.

### IV. The Liman and Other Plan Provisions

The fourth issue before us concerns the enforceability of certain Plan provisions. In the action for declaratory relief, Trustee requests a judgment that certain provisions of the P & I policies are unenforceable under the Plan. Specifically, Trustee asserts that (1) Trustee is not obligated to

---

8. See, supra, issue two concerning allocating coverage.

pay claims prior to seeking reimbursement from American Club and (2) American Club is obligated to pay directly to the appropriate claimant all amounts of his or her allowed claim, less any applicable deductible.

According to American Club, the Plan does not alter the rights and obligations of the parties under the relevant policies and applicable law. First, Club states that the Claimants do not have a direct right of action under the P & I Policies against it. Second, Club argues that the Plan does not alter the requirement that the Trustee pay a claim before Club is obligated to indemnify. Third, American Club argues that the so-called *"Liman"* arrangement in the Plan, which operates to satisfy the "pay first" obligation, should not be enforced for claims preceding the 1977 insurance year.

■ We begin our analysis with the applicable Plan provisions. Section 4.05.03, states the following in pertinent part:

> ... subject to possible defenses to payment Clubs or other insurers may have, holders of Insured Claims in Class 5C ... may be entitled to payment in cash of Excess Claims,[9] directly or indirectly, from Clubs or other insurers.

Section 4.05.07(a)(i) provides, in pertinent part,

> Subject to the remainder of this Sec. 4.05.07(a) of the Plan and the terms of the PLI Disbursement Trust Agreement, the PLI Disbursement Trust will succeed to all insurance rights of PLI ... in existence as of the Effective Date, including any such rights to indemnification, reimbursement, contribution, or other payment in respect of any Personal Injury Claim or Cargo Damage Claim and any other such rights PLI may have to receive payment ...
>
> * * * * * *
>
> Subject to the rest of this Sec. 4.05.07(a) of the Plan, the PLI Disbursement Trustee is authorized to enter into agreements with one or more Clubs or other insurers ... which agreements provide in sub-

stance that holders of Allowed Insured Claims have Allowed Claims in Class 5C for the Deductible Claim and that the Club or other insurer shall make cash payments, directly or indirectly, to the holder of the Allowed Insured Claim for any Excess Claim.

The PLI Trust Agreement assigned to Trustee "all rights, contractual or otherwise, of PLI *existing as of the Effective Date* under or with respect to any policy issued by ... any insurer ..." (emphasis ours).

In substance, these provisions provide that Trustee shall succeed to PLI's rights in the P & I policies, but only to those rights PLI already had as of the effective date of a valid insurance policy. While the Plan permits Trustee to enter into an arrangement with the Club to provide direct payment to Asbestosis Claimants, nothing in the Plan obligates Club to agree. Thus, we hold that the Plan does not alter Club's contractual obligations as they exist under the P & I policies and applicable law.

■ Under the P & I policies, American Club is obligated to reimburse or indemnify Prudential only after PLI has made payment and made a claim on American Club. The policy provides, in relevant part,

> [t]he Association agrees to indemnify the assured against loss, damage or expense which the assured shall become liable to pay *and shall pay* by reason of the fact that the assured is the owner ... (emphasis ours).

In *Miller v. American S.S. Owners Mutual Protection And Indemnity Co.*, 509 F.Supp. 1047 (S.D.N.Y.1981), the Court held that a policy with identical language was a policy of "indemnity" under New York law. 509 F.Supp. at 1048. It is well settled under New York law that an insured cannot recover under a general indemnity policy until the insured has actually paid the underlying claim. See, *Miller,* 509 F.Supp. at 1049; *Cucurillo v. American Steamship Owners Mutual Protection & Indemnity Assoc.,* 1969 A.M.C.

---

**9.** "Excess Claim" is defined in the Plan as the amount by which the Allowed Insured claim exceeds the deductible.

2334, 2335 (Sup.Ct.N.Y.County 1969); 23 N.Y.Jur.2d, Contribution, §§ 65, 66. We hold that, except to the extent that American Club otherwise agrees, Trustee must pay an Allowed Insured Claim before American Club will be obligated to indemnify or reimburse the Trust.

Recognizing that American Club may refuse, in accordance with the P & I policies, to indemnify PLI unless the Trust "pays first," the Plan contains a so-called *"Liman"* provision under Section 4.05.07, which provides, in pertinent part,

[t]he PLI Disbursement Trustee is authorized to enter into arrangements under which in substance the PLI Disbursement Trust pays the Allowed Insured Claim in full in cash; the holder of the Allowed Insured Claim repays in cash the full amount of the Deductible Claim and the Club or other insurer reimburses the PLI Disbursement Trust in cash for the full amount of the Excess Claim (and any previously unreimbursed defense costs in excess of the applicable deductible incurred in connection with liquidation of the Claim); and the holder of the Allowed Insured Claim is given an Allowed Claim in Class 5C in the amount of the Deductible Claim.

In *Liman v. American Steamship Owners Mutual Protection and Indemnity Assoc.*, 299 F.Supp. 106 (S.D.N.Y.1969), aff'd, 417 F.2d 627 (2d Cir.1969), cert. denied, 397 U.S. 936, 90 S.Ct. 946, 25 L.Ed.2d 116 (1970) (*"Liman"*), which involved an almost identical P & I policy, the Court upheld a plan provision in which personal injury claimants of a debtor would agree that, in the event of a recovery against the debtor, the estate would pay the full amount of the recovery to the claimant and the claimant would thereupon repay the applicable deductible to the estate, in exchange for which the claimant would receive an unsecured claim against the estate in the amount of the deductible. *Liman,* 299 F.Supp. at 108.

American Club argues that the *Liman* provision should not be enforced against the Club because (1) the Plan permits the Trustee to enter into *Liman* arrangements

with insurers, but does not bind the insurers to agree and (2) *Liman,* though binding on this Court, was wrongly decided and should therefore not be applied to P & I policies prior to the 1977 insurance year. We reject both arguments.

■ While the Plan does not obligate Club to "agree" to enter into a *Liman* arrangement, neither does it require the Club's agreement. The *Liman* provision, set forth above, further provides,

The PLI Disbursement Trustee shall enter into no such arrangement and shall make payment of no such Claim unless it obtains satisfactory assurances and documentation that the PLI Disbursement Trust shall promptly receive in cash repayment and/or reimbursement of the full amount of the Allowed Insured Claim paid by the ... Trust.

\* \* \* \* \* \*

The ... Trustee may alternatively enter into any lawful arrangement designed to achieve the same purpose, as may be agreed upon by the holder of an Allowed Insured Claim and the ... Trustee, but ... may not use funds of the ... Trust ... unless adequate assurances and documentation are provided ensuring that the ... Trust will promptly receive repayment and/or reimbursement of all amounts paid by the ... Trust.

The Plan requires only that Trustee obtain assurances of prompt reimbursement before it pays a claimant. It does not require Trustee to obtain such assurances only upon the consent of the Club. We think the P & I policies themselves can be the basis of adequate assurances. The policies obligate American Club to indemnify the insured—the Trustee in our case—if the insured pays a claim which is covered under the terms of the policy. Should the Club refuse to provide indemnity in breach of its obligations under the policies, we have no doubt that we possess the necessary power to provide adequate assurance of reimbursement. 11 U.S.C. § 105(a). We therefore hold that Trustee may enter into *Liman* arrangements regardless of whether the Club itself provides assurances of prompt reimbursement.

■ We also find little merit in the Club's second argument concerning the correctness of the *Liman* decision. The District Court, in support of its holding in *Liman,* commented that the insurer should not be permitted a windfall by escaping its obligation to pay on policies on which the insured had paid substantial premiums. *Liman,* 299 F.Supp. at 109. We agree. Summarizing the relevant law, the Court said,

> [t]he courts of New York have repeatedly held that an insured fulfills his obligations under an indemnity policy and is entitled to reimbursement when a judgment against him has been satisfied, and the insurer may not escape its obligation to indemnify by showing that the payment made by the assured was advanced to it by a third party or financed in some other fashion.

299 F.Supp. at 109, citing, *Employers' Liability Assurance Corp., Ltd. v. International Milk Products Co.,* 192 App.Div. 88, 182 N.Y.S. 337, 339 (N.Y.A.D. 1st Dept. 1920). According to the District Court, the insured on an indemnity policy "was at liberty, so far as the [insurer] is concerned, to borrow the money and pay the judgment, even though it was insolvent, or on the verge of insolvency." *Liman,* 299 F.Supp. at 109 (other citations omitted). Applying this rule, the Court held "the test in New York is whether the assured has actually in good faith sustained the loss for which reimbursement is sought ..." *Liman,* 299 F.Supp. at 109.

We think *Liman* was correctly decided under the purpose and spirit of New York law. If the insured pays the claim, whether with or without funds borrowed from Claimants, it has satisfied the plain language of the policy. Club has not cited a single valid authority for its position that the "pay first" provision of an indemnity policy is not satisfied when an insolvent insured borrows funds to make an actual payment. Accordingly, we hold that the *Liman* provision in the Plan is valid and enforceable as to all policies.

## V. Setoff

The fifth issue before us concerns setoff under 11 U.S.C. § 553. American Club argues that it is entitled to offset the 1979, 1983, 1984 and 1985 past-due premiums and assessments against the benefits to be paid the Asbestosis Claimants under fully paid policies for different insurance years. Club also argues that executory contract law favors setoff.

The facts relevant to the setoff issue are as follows. The parties have stipulated, for the purposes of this declaratory judgment action only, that the Club currently has a net claim against PLI of $1,270,980 for unpaid premiums and assessments. The past due premium concerns the calendar year 1985. The unpaid assessments are due on the policies in effect in 1979, 1983, 1984, and 1985. These assessments were "levied" from 1985 through 1990.

Asbestosis Claimants have not sought collection on policies for which premiums have not been paid. Claimants agree that setoff would be proper if recovery were sought from past-due policies. Claimants also agree that Club is not liable for claims under policies issued for 1979, 1983, 1984 and 1985, subject to benefits being offset against premiums and assessments due according to the four policies. Asbestosis Claimants do not, however, agree that unpaid premiums and assessments should be offset against American Club's obligations to pay claims under fully paid policies. According to Claimants, each yearly P & I policy was a separate contract. Except for the four policies for which premiums were not paid, PLI satisfied all terms and conditions contained in the agreements.

The right to offset one's debts against corresponding debts owed a debtor was stated as early as 1675 in Anonymous, 86 Eng.Rep. 837, [K.B.]. *Matter of Midland Ins. Co.,* 167 A.D.2d 75, 569 N.Y.S.2d 951 (N.Y.A.D. 1st Dept.1991), aff'd, 79 N.Y.2d 253, 582 N.Y.S.2d 58, 590 N.E.2d 1186 (1992). Today, the right to offset mutual debts lives and prospers in both Bankruptcy and state law.

■ Under the Bankruptcy Code, a creditor's right to setoff is governed by 11

U.S.C. § 553, which provides, in relevant part,

(a) Except as otherwise provided in this section and in section 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

Section 553 has two general requirements. First, the creditor's debt to the debtor and the creditor's claim against the debtor must both arise before the commencement of the case. *In re Drexel Burnham Lambert Group, Inc.*, 113 B.R. 830, 22 Collier Bankr.Cas.2d 1708, 20 Bankr.Ct.Dec. 788, Bankr.L.Rep. ¶ 73,392 (Bankr.S.D.N.Y. 1990). Second, the debts and claim must be mutual; that is, they must in the same right and between the same parties, standing in the same capacity. *Modern Settings v. Prudential–Bache Securities*, 709 F.Supp. 70, 75 (S.D.N.Y.1989), aff'd in part and rev'd in part, 936 F.2d 640 (2d Cir. 1991), citing, 4 *Collier on Bankruptcy* (14th Ed.1978) ¶ 68.04[21] at 867.

 Section 553 permits setoff of unrelated claims if mutuality exists. *In re Interstate Record Distributors, Inc.*, 307 F.Supp. 1142 (S.D.N.Y.1970), aff'd, 430 F.2d 1017 (1970). As noted by Judge Cardozo, "to be mutual, they must be due to and from the same persons in the same capacity." *Beecher v. Vogt Mfg. Co.*, 227 N.Y. 468, 473, 125 N.E. 831. Mutuality does not require, however, that the debts arise out of the same transaction. Mutual debts contemplated in the case of setoff are generally those arising from different transactions. Debts arising from the same transaction that may or may not be mutual are subject to recoupment. See, 4 *Collier on Bankruptcy*, § 553.03 (15th Ed.).

 Setoff rights are determined as of the date of the filing of the bankruptcy petition. *In re Denby Stores*, 86 B.R. 768, 791 (Bankr.S.D.N.Y.1988). When a creditor's debt arises post-petition, it is owed to the debtor-in-possession and therefore lacks the requisite mutuality with pre-petition claims of the creditor against the debtor. 4 *Collier of Bankruptcy* (15th Ed. 1991), para. 553.08[1]; *In re O.P.M. Leasing*, 68 B.R. 979, 986 (Bankr.S.D.N.Y.1987). A post-petition claim is therefore improper for setoff.

As provided in the statute, § 553 is not an independent source of setoff rights. The Bankruptcy Code simply preserves the common law right of setoff under applicable nonbankruptcy law. *In re Drexel Burnham Lambert Group, Inc.*, supra, 113 B.R. 830, 839.

 The applicable nonbankruptcy setoff law is "determined by applying the law of the state where the operative facts occurred." *In re Williams*, 61 B.R. 567, 571, 15 Collier Bankr.Cas.2d 70 (Bankr.N.D.Tex. 1986). Here, the P & I policies were entered into in New York, which is also the Club's principal place of business. We therefore look to New York law to determine American Club's right of setoff.

New York recognizes both equitable and statutory set-off. Statutory setoff is governed by Debtor and Creditor Law § 151, which provides,

Every debtor shall have the right upon: (a) the filing of a petition under any of the provisions of the federal bankruptcy act or amendments thereto ... by or against a creditor ...

\*　　\*　　\*　　\*　　\*　　\*

to setoff and apply against any indebtedness, whether matured or unmatured, of such creditor to such debtor, *any amount owing* from such debtor to such creditor, *at or after*, the happening of [the filing of a bankruptcy petition].

\*　　\*　　\*　　\*　　\*　　\*

the ... right of set off may be exercised by such debtor against such creditor or against any trustee in bankruptcy [or] debtor in possession ... claiming through or against such creditor or such trustee in bankruptcy [or] debtor in possession ...

New York Debtor and Creditor Law, § 151 (McKinney's Supp.1991) (emphasis ours).

■ To be available for setoff under § 151, PLI's debt to American Club can be matured or unmatured, but it cannot be contingent. *Trojan Hardware Co. v. Bonacquisti Construction Corp.*, 141 A.D.2d 278, 534 N.Y.S.2d 789, 791 (N.Y.A.D. 3rd Dept.1988). An unmatured debt is generally evidenced by a contract and can be expected in the normal course of events to be due and owing in the future, although the obligation has not yet ripened. A contingent liability, however, is marked by uncertainty as to whether any obligation will ever arise. *Id.*

■ Under § 151, PLI's debts for premiums and assessments may only be offset against an indebtedness "owing" from the Club to PLI, or any entity claiming through PLI. The statute does not, however, give any indication of when a debt is "owing." Courts applying principles of equitable setoff have generally held that, where the debt is owed to an insolvent, it is available for setoff even if unmatured. *Gerseta Corp. v. Equitable Trust Co.*, 241 N.Y. 418, 422, 150 N.E. 501 (1926); *Siegel v. State of New York*, 262 App.Div. 388, 391, 28 N.Y.S.2d 958 (3rd Dept.1941).

At the time of its bankruptcy petition, PLI's debts to American Club were either matured or unmatured, but none were contingent. On the date of its petition, PLI was indebted for unpaid premiums on the 1985 policy. PLI's debts for unpaid assessments, some of which did not become due until post-petition, were contractual obligations undertaken by PLI on the P & I policies during the years 1979 and 1983 through 1985. Thus, those debts for assessments that did not become due until post-petition were nonetheless unmatured claims as of the debtor's bankruptcy. They have since become matured claims.

Applying New York Debtor and Creditor Law § 151 to the facts of this case, we conclude that the debt must be owing at or after PLI's bankruptcy to warrant setoff.

We therefore hold that American Club may offset unpaid premiums and assessments against sums payable to Trustee and Asbestosis Claimants under triggered policies.

American Club's right of setoff, however, exists subject to the insurer's obligations under the relevant policy agreements. If·American Club chooses to exercise this right of setoff, the 1979, 1983, 1984, and 1985 policies are obligated, subject to our holdings, supra, to indemnify the Trust for asbestos injuries occurring following exposure during those insurance years.

We reach this conclusion because of the following two facts. First, Club's position that it was not obligated under the 1979, 1983, 1984, and 1985 policies to pay asbestos claims rests on PLI's nonpayment of premiums and assessments. If American Club were to offset the amounts owing for premiums and assessments against payments for asbestos claims, Club could no longer use nonpayment as a reason not to indemnify under the relevant policies if coverage were triggered. Second, the relevant P & I policies require that American Club cancel policies via written notice.[10] No evidence of cancellation has been submitted by either party. We therefore must assume, under summary judgment standards, that the 1979, 1983, 1984, and 1985 policies may be revived by payment of the past due premiums and assessments, thus renewing American Club's obligation to indemnify the Trust for payments made to Asbestosis Claimants.

■ American Club also argues, under the doctrine of *cum onere*, that the insurance policies relevant here are executory contracts that must be accepted or rejected in full. The Club concludes that PLI Trustee must assume all P & I policies as an aggregate to reap the benefits of the policies. We find little merit in this position.

---

10. For example, a 1979 P & I policy provides the following:

In the event of non-payment of the full premium within sixty (60) days after attachment, or, if installment payment of the premium has been arranged, in the event of non-payment of any installment thereof within twenty (20) days after it was due, this policy my be cancelled by the Association upon five (5) days written notice being given the Assured ·...

See, Exhibit C, Agreed Statement of Facts, ¶ 29(b).

The insurance policies American Club issued to PLI were separate and distinct contracts. No policy language conditions indemnification on the payment of premiums and assessments due under different policies. Each policy contained its own period of coverage, deductible, and policy limit. Trustee is therefore free to choose among the paid policies for ultimate indemnification of asbestos claims according to his determination of which policies benefit the estate. Trustee need not assume the unpaid policies to receive the benefits owing from triggered P & I policies.

We conclude that American Club is entitled to partial summary judgment concerning the setoff issue. If American Club chooses to exercise this right of setoff, the amount of unpaid premiums and assessments, stipulated by the parties as $1,270,-980, shall be offset against payments made by American Club under all triggered P & I policies. Setoff will, however, resuscitate the Trust's rights to receive contractual benefits under these policies, including rights to indemnification for amounts paid to Asbestosis Claimants for personal injuries. If requested, American Club's motion for relief from the automatic stay to permit setoff of unpaid premiums and assessments will be set for hearing consistent with 11 U.S.C. § 362, *et seq.*

## VI. Interest

The sixth and final issue before us concerns whether American Club is entitled to interest accruing post-petition on prepetition past-due premiums and assessments for 1979, 1983, 1984, and 1985.

Claimants argue that American Club is not entitled to the interest on two grounds. First, the Plan makes no provision for the payment of post-petition interest. Club should therefore have raised the interest issue at or prior to confirmation, not after. Second, Claimants argue that Club's claim for post-petition interest is actually a request to have its claim treated as an administrative expense. Under 11 U.S.C. § 503(b), administrative expenses are allowed only if they are actual and necessary costs and expenses for preservation of the estate "for services rendered after the commencement of the case ..." Claimants conclude that earning interest on unpaid premiums and assessments was not necessary for the preservation of the estate.

We agree with Claimants that American Club should have raised the interest issue at confirmation of the Plan, rather than in a motion for summary judgment long after confirmation. Club's request for interest on unpaid premiums and assessments is denied.

## CONCLUSION

On the basis of the above findings of fact and conclusions of law, we conclude as follows:

1. American Club's P & I policies were triggered by injury-in-fact occurring during the applicable policy period. Injury-in-fact is exposure to asbestos during an applicable policy period.

2. In cases of multiple exposure during more than one insurance year, coverage under triggered P & I policies will be allocated only if a preponderance of the evidence proves that injuries resulting from asbestos exposure can be linked to a given triggered policy or policies. If evidence is unable to link exposure during a given period to resulting injury, American Club shall be jointly and severally liable up to stated policy limits for injuries flowing from exposure during any of the triggered policies. Asbestosis Claimants may select among the triggered policies according to standard joint and several liability practice. Summary judgment on the allocation issue is therefore denied.

3. Policy deductibles shall be applied per occurrence. An occurrence is defined as the underlying event that caused the injury. The occurrence was the presence of asbestos on PLI vessels during each policy year. American Club is entitled to one deductible for each of the triggered policies. American Club is not entitled to a deductible for each claim for personal injury arising out of the occurrence. Each P & I policy obligated to indemnify will therefore be able to claim one deductible, irrespective of the number of claims filed

against an individual policy. Summary judgment is therefore granted in favor of Asbestosis Claimants.

If evidence shows that allocating coverage is warranted, the deductible amount shall also be allocated on the basis of the same percentage as the allocation of coverage.

4. The "Liman" provision in the Plan is valid and enforceable. Trustee may enter into Liman arrangements regardless of whether the Club itself provides assurances of prompt reimbursement. Trustee may therefore borrow the funds necessary to pay the damages sustained by Asbestosis Claimants to satisfy the "pay first" provision in the relevant P & I policies. Summary judgment is granted in favor of Asbestosis Claimants.

5. American Club may offset unpaid premiums and assessments against sums payable to Trustee under the provisions of triggered P & I policies. As stipulated by the parties, the amount of the setoff is $1,270,980. If American Club exercises this right to setoff, the Trust is entitled to the contractual benefits of the 1979, 1983, 1984, and 1985 policies.

Partial summary judgment regarding this issue is granted in favor of American Club. American Club's motion for relief from the automatic stay will be set for a hearing, if necessary.

6. American Club is not entitled to post-petition interest on past-due premiums and assessments. The matter should have been raised prior to confirmation of the Plan. Summary judgment on this issue is therefore granted in favor of Asbestosis Claimants.

The parties shall settle an order on five days notice consistent with this Memorandum of Decision.